## ALBERT W. STOKES *et al.*

### *v.*

## ALEXANDER FRAZIER *et al.*

1. PLEDGE—*presumption as to time of payment.* Where bonds are pledged to a party as collateral security for money advanced by him to aid in doing the work for which the bonds were issued, and also for a share of the profits arising from such work, and no time is fixed for the payment of the money, the law presumes that a reasonable time is intended.

2. SAME—*who may purchase, etc.* The pledgee of bonds held by him as collateral security for the repayment of money advanced by him, can not become the purchaser of such bonds at a sale made by himself, in default of the payment of the money to him. If he does so purchase, the pledgor has the right to treat it as a valid sale, or to treat it as void; and if he elects to treat the sale as void, then the title to the bonds remains precisely as if

Opinion of the Court.

no sale had been made, with the lien of the pledgee still on them for the amount of his debt.

3. But if such sale is made by the pledgee fairly, in good faith and without any fraud, and a disinterested party becomes the purchaser, the title would pass to him, and the pledgee, on a settlement, would be chargeable with the proceeds of such sale, to be applied as a credit on the indebtedness for which the bonds were pledged as of the date of the sale.

4. INTEREST—*rate allowed on decree.* A greater rate of interest than six per cent can not be allowed, unless it is under a contract to pay more, not exceeding ten per cent, by a court of equity, upon a bill for an accounting.

5. CHANCERY JURISDICTION—*distribution of trust fund.* Where contractors with a city to make certain improvements, to be paid for in its bonds, borrow money of a party with which to prosecute the work, and deliver to such party the bonds when received, as collateral security, the lender to be repaid the money advanced, with interest, and to have one-third of the profits realized, and no time is fixed for repayment to him, or within which the collaterals may be sold, or a division of profits made, and the lender, nearly four years after, attempts to dispose of the bonds, they are so far in the nature of a trust fund as to give a court of chancery jurisdiction, on bill by one of the contractors to take an account, convert the securities, and distribute the fund.

6. PLEDGE—*of the notice of sale of collaterals.* Where municipal bonds are delivered as collateral security for money loaned, a notice of their sale by the pledgee published in a newspaper printed in the city where the bonds were issued, thirty days before the sale, and also in a newspaper published in Louisville, and they are sold in the latter city for more than they could have been sold in the city where issued, and no fraud is shown, the sale will be valid.

APPEAL from the Circuit Court of Pulaski county; the Hon. DAVID J. BAKER, Judge, presiding.

Messrs. LINEGAR & LANSDEN, for the appellants.

Mr. SAMUEL P. WHEELER, and Messrs. GREEN & GILBERT, for the appellees.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

It appears that Frazier and Carter became contractors with the authorities of Mound City, for the construction of a portion of the levee around the city. For the purpose of pro-

curing means necessary to prosecute the work, they applied to Stokes for a loan. He agreed to advance $8000, on which they were to pay ten per cent interest; to deliver to him the bonds they were to receive from the city in payment for their work, to be held by him as collateral security. He was also to receive one-third of the profits which they should make on the contract.

Frazier and Carter completed the work, at an outlay of $12,062.07, exclusive of the cost of tools and implements. As the work progressed, Stokes, at various times, advanced money, amounting, in the aggregate, to $8806.56, and Carter advanced $3255.51; and the city, in payment for the work, at various times issued its bonds to the amount of $16,900, and credited Carter on a note held against him of $58.68, which discharged the city from the contract. Frazier advanced no funds. Under the agreement, Stokes received $12,000 of the bonds, and Carter retained the balance. Frazier and Carter agree that there is nothing to be settled between them on account of tools and implements used in prosecuting the work.

Stokes, not having been paid anything by Frazier and Carter, continued to hold the bonds in his hands, and Carter retained those which he received at the completion of the work. Frazier filed a bill for an account, and charged Stokes with intending to sell the bonds in his hands, and of becoming the purchaser; also, that Carter, without authority, had offered to sell the bonds in his hands. A temporary injunction, restraining Stokes and Carter from selling the bonds, was granted, and the court appointed a receiver, who took possession of all except $2200 of the bonds, which Carter had sold at eighty cents on the dollar before the injunction was granted. Afterwards, the court dissolved the injunction as to Stokes, and the bonds were returned to him by the receiver.

On the 2d day of January, 1871, after giving thirty days' notice in a paper published in the city of Louisville, Kentucky, where Stokes resided, and in a paper published in Mound City, he sold the $12,000 of bonds at auction, and became the purchaser of all but $1000, which was bid in by Henry G. Carter,

of Mound City. On a hearing, the circuit court treated this sale by Stokes as a conversion of the fund, charged him with the bonds at seventy-five cents on the dollar, charged him with the interest on the bonds from year to year, and allowed him interest on his advances, and applied the excess of interest received on the bonds to the principal of his debt against Frazier and Carter. This statement is made up to January 2, 1871, and interest at ten per cent on the amount of bonds at seventy-five cents on the dollar, over and above his advances, up to the 1st of April, 1874, the date of the decree, showed in the hands of Stokes $3860.73, two-thirds of which he was decreed to pay to Carter and Frazier, and Carter was decreed to pay to Stokes and Frazier each $19.82, and that $2700 of the bonds retained by Carter, over and above refunding the advances made by him, was decreed to be equally divided between the three parties. From this decree Stokes' executors appeal to this court.

It is first objected that chancery does not have jurisdiction of the subject matter of dispute in this case, but we think that the bonds placed in the hands of Stokes as collateral security were so far of the nature of a trust fund as to authorize a court of chancery to take jurisdiction, state an account, convert the securities and distribute the fund. When the bonds were pledged, no time was fixed within which they should be sold, and the money advanced by Stokes should be paid from the proceeds in case of a default in its payment, nor was any time fixed in which Stokes should be paid, nor was any time fixed in which a division of the profits was to be made. Near four years had expired after the work was completed, and Frazier had received nothing, and the bonds had not been disposed of nor the debt paid to Stokes. All these facts, we think, conferred jurisdiction, but it is carrying the rule to its furthest limit.

It is urged that the court below erred in finding that Stokes, by the attempted sale on the 2d of January, 1871, converted the fund, and should be charged with the bonds, at their fair market value. There would seem to be no kind of doubt that

the $1000 of bonds purchased by H. G. Carter at the auction sale were converted, as the pledge was then destroyed, and the absolute title passed to the purchaser. As to that amount of the bonds, Stokes was required to account either for the sum they brought, or if the sale was unauthorized, then for their fair market value; and the question arises, whether there was a want of power to sell these bonds as the sale was made, or whether there was any fatal irregularity in the sale. Where a pledge of this character is made, and no time is fixed for the payment of the money, the law presumes that a reasonable time is intended, and we must hold that four years would be ample.

It may be that the power to insist upon and to enforce pay· ment was complete when the work was finished. If so, then Stokes had forborne to exercise the power four years, wanting but a short time; nor do we see any irregularity in the notices or in the manner of conducting the sale. Notice was published in a paper printed in Mound City, the place where the bonds were issued, also in a newspaper published in Louisville, for sufficient time; nor is there anything to show that Louisville was not as good, or a better market than Mound City; nor does the evidence show that there was a sacrifice in the sale. It is true, that some few of such bonds were sold, or, rather, most of them were exchanged for goods or property, at from seventy to eighty cents on the dollar, but this does not show that $12,000 of such bonds put up at auction in Mound City would have brought more than fifty cents on the dollar. The evidence shows no fraud, in fact, in conducting this sale; but as to the other $11,000, bid in by Stokes, the other parties had the right to treat the transaction as a valid sale, or to elect to treat it as void, because a trustee can not purchase trust property at his own sale; and the other parties in interest in this case have repudiated it as a sale, and have thereby left the title to the property precisely as it was before the auction, with the same lien in favor of Stokes, to secure his debt. Having elected to avoid the sale, they thereby place all parties *in statu*

*quo*, neither the one nor the other party having lost or gained anything by the sale.

Had the purchase been made by a disinterested party, *bona fide* and for value, then it would have been different, as the title would have passed to the purchaser; and had Stokes sold without authority, or had his purposes and objects been to gain an undue advantage, he would have been required to account for the trust property thus sold, at its fair cash value; but in this case we can see no such purpose. He no doubt supposed he had a right to become a purchaser by being the highest bidder; otherwise, if he intended fraud, he would have had the bonds purchased by some one else for him, on a secret agreement that they were for Stokes; but we find nothing of the kind developed in the case.

Some stress is laid on the fact that Stokes made the sale *pendente lite*. We perceive no fraud in this. The injunction had been dissolved, and the bonds unconditionally returned to him, and he had a right to suppose that the court expected him to act as though the suit was not pending. The dissolution of the injunction removed all restraint, as there was no order requiring him to hold the bonds, or restraining him from selling them. There is nothing to show that he acted otherwise than in perfect good faith, although without legal authority, in attempting to become a purchaser.

The title not having been affected, by the sale, to this $11,000, and Stokes not being shown to have intended any fraud, these bonds still remain a security for the debt due to Stokes, precisely as they did before the sale, and it was error for the court below to find Stokes the purchaser, and that his debt was satisfied. The court should have required the surrender of these bonds to a receiver, or to the master, to be sold at such time and place, and on such terms, as the court deemed for the best interest of the parties, and to have applied a sufficient amount of the proceeds to pay the debt to Stokes; but as he had converted the $1000 of bonds sold to H. G. Carter, the proceeds of that sale should be applied as a credit, as of the date of the sale, on Stokes' claim.

The court also erred in charging Stokes with ten per cent interest per annum on any balance supposed to be in his hands. A greater rate of interest than six per cent can not be allowed, unless it is under a contract to pay more, not exceeding ten per cent. This is the provision of the statute, and a court of equity can not repeal or disregard its requirements.

The decree of the court below is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*Decree reversed.*