ELINORE I. JOHNSON, Plaintiff, *v.* FRANCIS D. WINSLOW and Others, Defendants.

Supreme Court, New York County, April 6, 1935.

*C. Frank Reavis* [*Martin D. Jacobs* of counsel], for the plaintiff.

*Hays, St. John, Abramson & Schulman* [*Arthur Garfield Hays* and *William Abramson* of counsel], for the defendants.

BLACK, J.   This is an action in conversion, plaintiff claiming that defendants breached their trust as her agents by converting to their own use certain securities which she had pledged with them as brokers, by selling to themselves said securities without her knowledge.   Defendants' brief says: "We concede that the defendants had no right to purchase the plaintiff's securities for their own account.   We do not believe that anyone will claim, however, that the defendants acted fraudulently."   And defendants seek to

avoid the effects of the conversion by saying that " this method of dealing in unlisted securities has been the practice of their business for years." Defendants also claim that the damages sought are disproportionate to the conversion; that what they did was done in pursuance of a universal custom among brokers in unlisted securities; that plaintiff was notified of what had been done by them; that she waived any rights she may have had on account of the conversion by acquiesence or ratification and by her failure to investigate what had happened, and that there was an account stated between plaintiff and defendant. Plaintiff denies these contentions.

Before taking up these points seriatim and stating the facts necessary to decide who shall prevail, it may be observed at the outset that in deciding every case the court must have four things in mind: *First*, whether the rights of a plaintiff have been violated; *second*, not only the damage that arose actually, but also the potential damage that might have been suffered; *third*, the effect of a decision that would glaze over the violation of the rights of a litigant in a particular case, and *fourth*, the result that would follow from making a precedent of a case for every other court that has to pass upon a question.

It is not necessary, in view of the concession of counsel and of the undisputed facts, to discuss whether there was a conversion of plaintiff's securities. The law declaring that there is such a conversion is founded upon the principle of the highest faith between principal (the plaintiff customer in this case) and the agent (defendant broker).

If there was a conversion there remains nothing for the court to do except to assess damages, unless there was a ratification of defendants' sale to themselves of these securities of plaintiff. There was no knowledge on the part of plaintiff upon which any such ratification could be predicated in this case. In the absence of this element there can be no ratification of a conversion. (*Irwin v. Williar*, 110 U. S. 499, at pp. 514, 515.) A sale made as the result of such conversion is voidable and plaintiff has the right to claim the difference between the price at which her securities were sold by defendants to themselves and the value at the time when plaintiff disaffirmed the transaction and offered to defendants any amounts due in regard to said securities.

The amount sought is $62,916.65. On August 25, 1931, plaintiff guaranteed the account of her son-in-law, Charles E. Van Vleck, with defendants, agreeing to meet all margin calls and agreeing that defendants, the brokers, should hold as collateral security for Van Vleck's account all securities in her account which she estab-

lished August 28, 1931, depositing with them some $379,000 of bonds, $20,000 of which were Liberty bonds. Thereafter on January 14, 1932, she deposited with them bonds of the value of $67,000, February 11, 1932, bonds of the value of $35,000, April 13, $45,000, and May 11, $28,000 more. Thereafter on May 14, 1932, February 23, 1933, February 25, 1933, February 27, 1933, and April 1, 1933, defendants sold bonds that had been deposited by her. There was credited to her account from sales $388,495.55. The entire debit balance of the Van Vleck account was satisfied and the securities held by defendants for his account were released to him or to his order. The written guaranty given by the plaintiff to the defendants reads as follows:

" *August* 25, 1931.

" Messrs. MUNDS & WINSLOW,
        " 25 Broad Street, New York City.
    " GENTLEMEN: In consideration of your continuing to carry or the opening and carrying of an account (which you may terminate at any time) of Mr. Charles E. Van Vleck, hereafter called the customer, which account is designated on your books as: Mr. Charles E. Van Vleck, I/We hereby guarantee that the said account shall at all times meet your marginal requirements, and hereby authorize you, without prior notice or demand on the customer, to use and apply any and all collateral and equities that you may hold or have in any account or accounts, for me/us to make good any deficit in your marginal requirements in customer's said account, and I/We agree to make good any deficit in the marginal requirements in my/our account or accounts after such use and application by you, and I/We further guarantee the payment by the customer of all moneys hereafter to become due to you in the said account, and hereby give you a lien on and you may hold as collateral security for customer's said account and any and all of my/our said securities and equities; and I/we hereby expressly waive notice of the acceptance of this guaranty and all demands and notices to me/us or to the customer whatsoever.
    " This Guarantee shall remain in full force and effect so long as the customer shall carry the said account with you.
                " Yours very truly,
                    " (signed)   ELINOR I. JOHNSON."

Plaintiff claims that under the transactions had with the defendants, and as to the purported sales so made by the defendants, she understood and believed that said bonds had been sold by the defendants acting as brokers for her. That it was not until on or about the 7th day of August, 1934, after making inquiries of the defendants in regard to the particulars concerning sales of the

bonds so deposited by her, that she was advised and learned for the first time that said bonds were not sold by the defendants for her account, but that the defendants, who were her brokers, themselves wrongfully purchased said bonds from her for their own personal account. That thereafter, and on or about the 10th day of August, 1934, plaintiff notified defendants that she disaffirmed the pretended purchases of the bonds by the defendants and that the pretended purchases were wholly void and of no effect against her, with the result that she was still the rightful owner of said bonds, subject to the payment to defendants of any amount which might be due them. Plaintiff demanded that the defendants deliver and surrender the bonds and offered to pay them at the time of such delivery any indebtedness due defendants, or the amount of any lien defendants may have had in regard to said bonds. The defendants denied that plaintiff had any interest in the bonds and refused to deliver or offer to deliver the same against payment to them of any indebtedness or lien which they might have thereon. Plaintiff claims that since the demand she is ready, willing and able to pay any and all indebtedness due the defendants.

Plaintiff claims that at the time of the demand the bonds had a market value of the sum of $451,412.20; whereas the amount purported to have been credited by defendants to plaintiff's account was $388,495.55.

Plaintiff demands the difference in value as damages for the conversion of her bonds and fixes this difference at $62,916.65, with interest from August 17, 1934.

The court is of the opinion that under the facts of this case, and all the decisions, there was an undoubted conversion by defendants of plaintiff's securities by reason of their having sold bonds of plaintiff to themselves without her knowledge.

In *Roach* v. *Duckworth* (95 N. Y. 391 [1884], at pp. 401, 402): " It is undoubtedly the rule that the pledgee cannot, at a sale by him of the property pledged, himself legally become the purchaser (*Bryan* v. *Baldwin*, 52 N. Y. 232). But the sale in such case is not absolutely void, but voidable only."

The court said in *Trowbridge* v. *O'Neill* (243 Mich. 84, 87; 219 N. W. 681 [1928]): " ' If employed to sell, the agent may not become the purchaser; and if employed to buy, he may not be the seller ' (21 R. C. L. p. 829).

" There are many authorities to support the first part of the rule. Our latest expression indorsing it will be found in *Cohane* v. *Eston* (240 Mich. 234). The latter part of the statement is, we think, equally sound. In *Taussig* v. *Hart* (58 N. Y. 425, 428) the court said:

"'But the plaintiffs allege that they transferred to the defendant's credit one hundred shares of their own stock at 111¾, on the day when the stock would have been deliverable had it been bought "regular." That transaction did not help the matter. It amounted to a sale by the plaintiffs of one hundred shares of their own stock to the defendant, which was not binding upon the defendant, for the reason that the law does not permit an agent employed to purchase to buy for himself. It is no answer that the intention was honest and that the brokers did better for their principal by selling him their own stock than they could have done by going into the open market. The rule is inflexible, and although its violation in the particular case caused no damage to the principal, he cannot be compelled to adopt the purchase.'

"The holding in this case is cited as authority in 2 Mechem on Agency (2d ed., pp. 1975–1976), and in 2 Clark & Skyles on the Law of Agency (sec. 764); see, also, *Mayo* v. *Knowlton* (134 N. Y. 250, 252; 31 N. E. 985), and *Commonwealth* v. *Cooper* (130 Mass. 285, 288)."

Where a stockbroker without authority transfers to himself stock of a customer in his hands for sale, in case the stock is subsequently sold at an advance, the customer can charge him with any profits realized from the transaction or can treat him as having converted the stock to his own use and charge him with damages for the conversion. (*Taussig* v. *Hart*, 49 N. Y. 301 [1872].)

The decision in the case at bar is arrived at after having considered whether plaintiff had knowledge of the facts that defendants, her brokers, were acting toward her in the capacity of dealers. Before buying the bonds of plaintiff defendants had already themselves sold them at a profit of $4,784.28, whereas their commissions would not be more than $1,135. The defendants' contention is that the transactions must be considered as trades between themselves as dealers and the plaintiff because at the time of each purchase by themselves of plaintiff's securities they notified the plaintiff and her agent by sending written printed confirmations of such purchases reading, "We confirm *purchase* from you," instead of sending the plaintiff the form reading, "We have sold for your account." They claim that the latter form is the one used where stocks are sold to outsiders, and that the former is the form used to confirm sales to themselves from customers.

Defendants have the burden of proving that plaintiff knew that defendants had themselves bought her securities. They have not done so.

In *Williams* v. *Bolling* (138 Va. 244; 121 S. E. 270 [1923]) the court adopted the opinion of the court below, to the following effect:

" As will be seen, from the above authorities, nothing will defeat the principal's right of remedy except his own confirmation after full knowledge of all the facts. But the burden of proof is on the agent, in a transaction of this character, to prove that the principal was fully informed of all the facts within the agent's knowledge. (*Jackson* v. *Pleasanton*, 95 Va. 654, at p. 658; 29 S. E. 680.) "

In this case there was one dissenting opinion, but upon application for a rehearing the decision as formerly announced was adhered to.

In the case at bar defendants notified plaintiff on the 30th day of December, 1931, by circular letter that they would continue to do a " strictly commission " business. This was enough to prevent any suspicion at that time from arising that they would participate as principals in a trade with their customers. Later, after the plaintiff's securities had been bought by defendants themselves, they sent her a so-called " confirmation slip " which read: " We confirm purchase from you." This must be considered first in litera. It simply says that " we confirm purchase from you." It does not say, " We confirm purchase by ourselves from you," nor does it say, " We confirm purchase from you by *ourselves*." It might apply to any purchase. It did appear from forms used in an ordinary purchase by others than an agent (broker) that a different form was used, which said, " We confirm purchase *for your account*." The court can see no real difference in the meaning of these two confirmations judged merely by their words. Suppose the confirmation had read, " We confirm purchase for your account;" how could that have thrown any light on who the buyer was? In the opinion of this court a confirmation is, as between a layman and a broker, in effect, merely a question mark of report. If there was a proper purchase or sale it needs no confirmation further than a memorandum of the exact date, price and kind of securities. A confirmation can add nothing to a transaction. By a confirmation it is intended to call attention to a transaction in order that there may be no mistakes made. After a trade has occurred, where it is not claimed there was any mistake made by either party, it is merely a questionnaire sent to the customer which, in effect, says " it is our understanding that the purchase or sale is such and such." " If our understanding is not correct, let us know and we will both straighten it out." But if acquiescence in such a trade covered by such a questionnaire is invoked, the question it asks must be so definite that it cannot be misunderstood. There are some hundreds of pages of stock exchange and clearing house rules and the layman cannot be expected to give any paper any more effect than it carries on its

face. Both the plaintiff and the employee of the custodian bank swear that it conveyed no intimation to either of them that the securities had been bought by defendants themselves.

The courts have held that there is nothing sacrosanct about " confirmations," and in the case of *Porter* v. *Wormser* (94 N. Y. 431 [1884]) the opinion reads (p. 447): " The principle is undeniable that an agent to sell cannot sell to himself, for the obvious reason that the relations of agent and purchaser are inconsistent, and such a transaction will be set aside without proof of fraud. The claim that the defendants purchased the bonds themselves, is based upon certain notices in writing, sent by defendants to the plaintiff, of the several alleged sales headed ' Bought of D. M. Porter, Esq., by I. and S. Wormser,' containing a statement of the particular amount of bonds sold and the price and accompanied in each instance except one, by a letter signed by the defendants, referring to the notice inclosed. The defendant Nathan testified that the bonds were sold by the defendants, between the calls at the offices of the different dealers in government bonds, and there is no evidence to the contrary, except the notices referred to, which the witness said, in answer to a general question, repre- sented the transaction therein referred to. It is insisted that these notices, which the counsel characterizes as ' purchase notes,' conclusively determine the point that the defendants were the purchasers of the bonds, and that parol evidence was inadmissible to show that they sustained any other relation to the transaction, or that in fact the bonds were sold to third persons. We think the defendants were not precluded from showing the real transaction, and that the rule that parol evidence is inadmissible to change or vary written contracts has no application. The notices were simply reports by an agent to his principal of his proceedings in the execution of the agency. The plaintiff impeaches the agent's transaction, because upon the face of the reports the agent appears to have undertaken to execute an agency to sell, by selling to himself. It was, we think, admissible for the defendants to show the actual transaction, and that by mistake or inadvertence it was misrepresented in the written advices."

In the above case it was also held that the headings to the notice of sale by defendants to plaintiff indicated that the bonds were bought of plaintiff by defendants; plaintiff claimed that defendants, as his agents, could not purchase, and so that the sales were void; defendants, however, proved that the sales were made to others. *Held*, that defendants were not precluded by the notices from showing the real transaction.

Meyer in his excellent treatise on the "Law of Stock Brokers and Stock Exchanges," section 43a of the supplement of 1933, at page 32, points out the difference between the relationship of a broker and his customer, and the relationship of vendor and vendee. He says: "There is nothing in the law which prevents a person from engaging in the business of buying and selling securities for his own account as principal. Such a person is a security *dealer* as distinguished from a *broker*. His rights and duties have been before the courts for adjudication repeatedly."

He quotes from the case of *Coolidge* v. *Old Colony Trust Co.* (259 Mass. 515; 156 N. E. 701) as follows: "If one of his customers wanted one of the real estate stocks in which Burroughs [the dealer] specialized he quoted a price, intended to be sufficiently above the price at which he could buy to insure himself a satisfactory profit. When his customer accepted the price quoted, Burroughs then went into the market and bought the stock as cheap as he could and kept the difference. If he could not get the stock at a price that gave him a profit, he would go back to the buyer and get him to raise his bid. When a customer wanted to sell, the method was reversed. The practice was to get as wide a spread as possible between the bid and asked prices and to conceal from each customer the price paid or received by the other. In only rare cases was stock bought or sold on a commission basis. The relation between Burroughs and his customers was that between buyer and seller or debtor and creditor."

Meyer's book continues: "He [the broker] sells to his customers, at price which usually affords him a profit, securities which he has purchased for his own account elsewhere, or buys from his customers securities for his own account with a view of disposing of them elsewhere at a profit."

In the case at bar the brokers had already sold plaintiffs securities at a certain price before they bought them.

Meyer continues: "Among those who ordinarily act as stock *dealers* rather than as stock *brokers* are 'over the counter' houses, which deal in securities not listed on exchanges."

Meyer further points out: "However, a stock *broker* may also become a stock *dealer* toward his customer in any one transaction, even though he has acted as broker in other transactions," and he quotes the case of *McNulty* v. *Whitney* (273 Mass. 494; 174 N. E. 121) to the effect that: "Where the course of dealings between the parties has established a relationship of customer and *broker*, the customer is justified in assuming that that relationship will continue, and will not become one of buyer and seller, unless he is notified by the broker of the latter's intention to change the relationship."

He continues: " (1) Transactions are usually confirmed by stock *dealers* to customers in language somewhat as follows: ' We are pleased to confirm sale to you,' or ' We are pleased to confirm purchase from you.' Stock *brokers*, on the other hand, usually couch their confirmations in language somewhat as follows: ' We have this day bought for your account and risk * * *.' (2) A stock *dealer* ordinarily charges no commission, whereas a stock *broker* usually does make such a charge. (3) A stock *dealer* usually sells to his customer at a price different from that at which he has purchased the securities elsewhere, or buys from his customer at a price different from that at which he resells elsewhere. A *broker*, on the other hand, must confirm the purchase or sale to his customer at the exact price at which he himself buys or sells. He is not permitted by law to make a secret profit; nor is he permitted to supply his own stock in fulfillment of a purchase made for a customer, or take for his own account stock which he has sold for a customer. The presence of these three circumstances in any particular transaction is strong evidence that the relationship between the parties was that of stock *dealer* and customer rather than that of stock *broker* and customer. * * * In the last analysis, the question to be determined is the relationship which the parties intended to assume, and the intention of the parties, if not disclosed by an express agreement, must be gathered from all of the facts and circumstances of the particular case."

Meyer further points out: " However, a stock *broker* may also become a stock *dealer* towards his customer in any one transaction, even though he has acted as broker in other transactions," and he again quotes the case of *McNulty* v. *Whitney* (273 Mass. 494; 174 N. E. 121). In that case the court said (at p. 501): " There was nothing in the form of the order for the Nonquitt Spinning Company stock to indicate that the transaction was not to be executed by the defendants as brokers in accordance with arrangements made when they undertook to buy stock for the plaintiff on margin. He had a right to assume that in all the transactions concerning the buying and selling of stock the defendants would continue to act as brokers unless notified in some way that the relationship had changed. He testified that he was not so notified."

In regard to the legal effect of the slips, the court said: " To maintain the contention that they bound the plaintiff with knowledge that he was buying the defendant's property, it must appear not only that he read or should have read them but also that if read they would give him notice of a direct sale. The absence from the slips of a charge for commission could not be ruled to

be notice of a direct sale, especially in view of the answer received by the plaintiff when he directed the attention of the defendant's agent to this omission. It cannot be said as matter of law that the words ' Sold to ' on the slips concerning the stock in question, either when the slips are considered by themselves or in connection with other slips representing purchases by the defendants as brokers, bound the plaintiff with notice that the defendants were selling him their own stock. (See *Metcalf* v. *Williams*, 144 Mass. 452; *Greenburg* v. *Whitney*, 245 Mass. 303, 306.) The words are not necessarily inconsistent with the interpretation that the brokers were selling property of another customer as in *Hall* v. *Paine* (224 Mass. 62, 74, 76). It was for the jury to say under all the circumstances whether the confirmation slips were notice to the plaintiff that he was buying directly from the defendants, or should have put him upon inquiry to ascertain if that was so (*Picard* v. *Beers*, 195 Mass. 419, 428)."

So in the instant case the confirmation slips, " We confirm *purchase* from you," did not of themselves put the plaintiff upon inquiry to ascertain whether or not the defendants were actually purchasing the bonds themselves instead of selling the same to third parties. More than that, the defendants wrote the plaintiff that they did a *strictly commission business*, and the other communications from defendants to plaintiff referred to the purported transactions as sales for her account.

With all of the above quotations I agree, but I add to the very clear statement of the law that in order to show that the relationship has changed from that of customer and broker for a particular transaction there must be evidence that the parties agreed to such change for the particular transaction, or that the conduct of the parties was such as to imply acquiescence and consent after full knowledge by the customer. It may be that among dealers and brokers in that line of business a confirmation that " we confirm purchase from you " would be sufficient to bring home knowledge that the relationship of dealer and customer existed, but where, as here, the relationship that existed between them from the start was that of customer and broker, the mere sending of the confirmation referred to did not and could not thereby change the relationship from that of customer and broker to that of dealer and customer. The customer has the right to assume that the same relationship continues until it is changed by agreement or by such conduct on the part of the customer as ratifies the new relationship.

The court has given considerable time and study to the issues of law and fact presented here, and it seems to me that there

should be some rule adopted by the Stock Exchange and/or by authority of government control which would prohibit a condition of affairs which this case discloses, to the effect that no broker will be permitted to buy in his own name or to sell his own stock to a customer, where the relationship is that of broker and customer, without the consent and authority of the customer *in writing*. The writing should contain such information to the customer as to inform him that the relationship of dealer and customer is one which permits the broker to sell stocks of his own to the customer and also permits the broker to purchase the securities himself and sell to third parties after such purchase. In any event, the broker should after the purchase notify the customer of the price which he has obtained in the sale of the securities or stocks. When the broker sells his own stock to a customer, he should with such sale inform the customer of the amount of such stock he owns or controls and the price which he paid for it and the date when he purchased or obtained control of such stock. The rule should apply not only to listed, but unlisted, securities and stocks.

In the instant case the plaintiff was a layman, and was not fully acquainted with all the technicalities of the street or dealings on the exchange. She had a right to assume that the relationship of customer and broker, a fiduciary, would protect her, to the end that in acting for her, they would do all in their power to protect her account with them, and that in so doing she would get the full advantage of the knowledge of the defendants as such brokers in the management and care of the account. This she had a right to assume, and this she was entitled to. The defendants claim that the confirmations were also sent to her agent, to wit, the Florida National Bank of Jacksonville, and that such confirmations found their way to one Harold I. Clayton, an employee of said bank. There was no proof in the case which would establish such agency on the part of the bank by the broker as to impute knowledge to the plaintiff. Even if we assume that the bank was an agent of the plaintiff I cannot hold that the mere fact that the confirmations were sent to them as such agent is absolute knowledge that there was an existing agreement or understanding between the plaintiff and defendants, whereby the relationship was that of dealer and customer and not that of customer and broker. There was no agreement established by the defendant to show the relationship of dealer and customer either express or implied. It was, however, established by the plaintiff that the relationship existing between the parties was that of customer and broker. The bank was employed by the plaintiff not as agent but merely

to be the custodian of her securities and to prepare her income tax returns. In accordance with this employment, it was necessary that the bank receive various letters, statements of account and confirmations. The plaintiff and the employee of the bank both testified that the confirmations sent did not inform them that the defendants had purchased any of the securities in question, and while the words, " We confirm purchase from you " were on the confirmations, the words either were not looked at or were not completely observed, and in any event they did not mean anything to them. I believe this testimony to be true and hold that the mere sending of the confirmations under the relationship of customer and broker did not and could not change such relationship except after full knowledge of such change attempted by the defendants. No proof has been submitted to me whereby any ratification was made by the plaintiff or even her agent, so called, after full knowledge had been given. No agreement either express or implied has been given to change the existing relationship of that of customer and broker. The law is well settled that the fiduciary relationship between the customer and broker requires full faith and confidence be given to the acts of the brokers in the belief that they would at all times be acting for their customer in all his dealings, and the plaintiff had a right to assume and to rely upon the fact that they were acting for her benefit at all times during the existence of such relationship.

A broker must fully inform his customer concerning material facts of a transaction. (*American Cotton Mills* v. *Monier*, 61 F. [2d] 852 [1932], Circuit Court of Appeals, 4th Circuit.)

A stockbroker employed by a customer cannot, without the knowledge and consent of the customer, fill the order with stock owned by himself. (*Matter of Solomon & Co.*, 268 Fed. 108 [1920], Circuit Court of Appeals, 2d Circuit.)

The evidence here is not seriously disputed that the defendants at the time of the alleged purchase from plaintiff in each instance had, before themselves buying plaintiff's bonds, sold to a customer of their own, and in every instance the price they paid the plaintiff was below the prices which they had obtained. They assert that there was a custom as to unlisted securities, whereby they were authorized and justified in their conduct by first getting a customer for their own account and then purchasing from the customer at two or three points lower than what they had sold them for. Defendant, however, failed to prove such a custom. If there be such a custom where the relationship existed between parties as dealer and customer, such custom has no relevancy in the instant case, for there is no proof here to establish the existence of such

relationship between the parties. The testimony is very pointed on this issue. Defendant's counsel on the trial said: " We should not have done it. We have done it for years and we made a mistake." Allen, one of the defendants, referring to the fact that defendants in selling out a customer would purchase his unlisted securities, said " that was our usual practice and the way we did business." The witness Allen testified that this was the way of defendants doing business, even though he had never heard of any other brokerage firm " ever buying the securities from a customer when the customer is forced to sell pursuant to a margin call." The person in charge of defendants' trading department admitted that the easiest part of the business in his department, which always made money, was " to make money out of buying your customers' securities and reselling them."

After a close study of the evidence and the minutes which have been furnished me, I have arrived at the conclusion upon the whole evidence that there is nothing in the record from which the witness Allen or the defendants could assume that the plaintiff had knowledge of the technicalities of the brokerage business, or that she knew the different relationships that exist between customer and broker and that of dealer and customer. The evidence satisfies me that she had no technical knowledge, nor did the bank, who was her custodian, and not her agent, as the defendants contend it was. The plaintiff has fully and completely established the fact that the relationship between her and the defendants was that of customer and broker and that the defendants' duty as a fiduciary in that regard required them to sell the securities for her and to give her credit for the proceeds of such sale. The relationship of customer and broker did not permit them to purchase the securities and to make a profit without asking her. I have concluded that the purchases by the defendants were illegal and voidable and in the circumstances the defendants were chargeable with possession of the bonds when the plaintiff discovered the illegal acts of the defendant, though it was sometime after the transactions between the parties had terminated. It matters not how long a time existed between the actual transaction and the discovery thereof unless the plaintiff can be charged with knowledge of the facts so as to amount to ratification, which the evidence here does not show. She was wholly without knowledge of the acts of the defendant until demand was made by her for the return of the bonds. The plaintiff was ready, able and willing to pay at the time of the demand and the defendant refused to deliver upon such payment of their lien and the amounts due.

A stockbroker is in the position not only of agent and pledgee, but also of trustee. The rule putting the broker under absolute disability to purchase collateral deposited by the customer is not an outworn technical rule of law, but is founded upon practical considerations, shown most vividly by the facts in the instant case. (See *Stiebel* v. *Lissberger*, 166 App. Div. 164; affd., 222 N. Y. 604.) The Appellate Division in applying the principles of law, at page 168, said: " These are well settled and are stated in Dos Passos on Stockbrokers and Stock Exchanges (Vol. 1 [2d ed.], p. 382), as follows: ' The effect of a purchase by a Broker or pledgee of the stocks of the Client or pledgor, as we have seen, is to render the transaction void, and the cases hold that such a purchase does not change the creditor's relation to his debtor, but that the securities are still held by the creditor under the original titles as security for the original debt. The transaction is treated precisely as if no sale had been made; and the debtor, in order to obtain another sale of the securities, or to redeem them, is not required to prove that the Broker or pledgee made a fraudulent sale or one disadvantageous to himself, but only that he became the purchaser. The Broker or pledgee in selling the securities is in the position of trustee for the Client or pledgor, and the law will not allow of the temptation to fraud or the possibility of the same through the trustee becoming purchaser at his own sale. But the pledgor has the option to treat the sale as valid, and to accept the benefits thereof.' " (*Brookman* v. *Rothschild*, 3 Sim. 224; affd., H. L., 5 Bligh [N. S.], 165; *Pigot* v. *Cubley*, 15 C. B. [N. S.] 701; *Stokes* v. *Frazier*, 72 Ill. 428; *Chicago Artesian Well Co.* v. *Corey*, 60 id. 73; *Bank of the Old Dominion* v. *Dubuque & Pacific R. R. Co.*, 8 Iowa, 277; *Hamilton* v. *State Bank*, 22 id. 306; *Maryland Fire Ins. Co.* v. *Dalrymple*, 25 Md. 242; *Baltimore Marine Ins. Co.* v. *Dalrymple*, Id. 269; *Bryson* v. *Rayner*, Id. 424; *Star Fire Ins. Co.* v. *Palmer*, 9 J. & S. [N. Y.] 267; *Richardson* v. *Mann*, 30 La. Ann. 1060; *Wright* v. *Ross*, 36 Cal. 414; *Bryan* v. *Baldwin*, 7 Lans. 174; affd., 52 N. Y. 232; *Duncomb* v. *N. Y., H. & N. R. R.*, 84 id. 190, 204; *Hope* v. *Lawrence*, 1 Hun, 317; *Duden* v. *Waitzfelder*, 16 id. 337; *Hamilton* v. *Schaack*, 16 N. Y. W. D. 423; *Middlesex Bank* v. *Minot*, 45 Mass. 325; *Ainsworth* v. *Bowen*, 9 Wis. 348; *Hestonville R. R.* v. *Shields*, 3 Brews. [Pa.] 257; see, also, *First National Bank* v. *Hall*, 22 App. Div. 356; *Glidden* v. *Mechanics' Nat. Bank*, 53 Ohio St. 588; 43 L. R. A. 737; " Purchase by pledgee," 43 L. R. A. 755; " Who may purchase," 53 L. R. A. 864.) (See, also, *Taussig* v. *Hart*, 49 N. Y. 301.) If we regard the brokers merely as pledgees, it is well established that a pledgee has no authority to purchase the pledged property himself. (*Duncomb* v. *N. Y., H. & N. R. R.*, 84

N. Y. 190, 204.) The reasons behind the rule were aptly stated in *Hall* v. *Paine* (224 Mass. 62; 112 N. E. 153), where the Supreme Court of Massachusetts, RUGG, Chief Justice, said (p. 73): " A broker's obligation to his principal requires him to secure the highest price obtainable, while his self-interest prompts him to buy at the lowest practical price. The law does not trust human nature to be exposed to the temptations likely to arise out of such antagonistic duty and influence. This rule applies even though the sale may be at auction and in fact free from any actual attempts to overreach or secure personal advantage, and where the full market price has been paid and no harm has resulted." More than that, the rules of the governing committee of the New York Stock Exchange, of which defendants were members, show that the transactions here set forth were in violation of chapter 11, section 1. The rule provides in part as follows: " No regular member, while acting as broker, whether as a specialist or otherwise, shall buy or sell, directly or indirectly, for his own account or that of a partner, or for any account in which either he or a partner has a direct or indirect interest, securities, the order for the sale or purchase of which has been accepted for execution by him, or by his firm, or a partner." (Meyer Law of Stockbrokers and Stock Exchanges, p. 1045.) This was ratified as of October 13, 1932, by amendment, and the arrangement committee referred to it in its compilation of July 5, 1932. (See 1933 supplement to Meyer Stockbrokers and Stock Exchanges, p. 198.)

It has been held that where a transaction is in violation of the rules of the exchange, neither party is bound thereby and may repudiate or disaffirm the same on discovery. (*Cohen* v. *Rothschild*, 182 App. Div. 408.)

The importance of the rule of law, applicable in this case, is well brought out by the testimony of Reilly, manager of the defendants' trading department. He testified that he would first resell the bonds and then fix the price of defendants' purchase from plaintiff at a lower price to insure defendants a profit. A customer would have no means of knowing how much defendants made on the resale. He would fix the price to the customer on his " own feeling of fairness," the very thing against which the rule of law is designed to guard. (See *Hall* v. *Paine, supra.*) We are not concerned in this case whether the prices of the bonds which were bought from plaintiff were fair and reasonable, but merely that the defendants violated their duty to the plaintiff when they purchased the bonds themselves when they should have been sold by them. As to the defenses interposed by the defendants, as I have said before, they have failed in them. There was no ratification, because

there was no knowledge in the plaintiff of the acts of the defendants. The plaintiff cannot be charged with negligence in not acting promptly, for the evidence shows that she did act with dispatch when she obtained knowledge of the defendants' acts. There was no account stated because at the time that the relations between the plaintiff and defendants were terminated and other brokers substituted, the plaintiff did not have any knowledge or suspicion that the defendants in their dealings with the plaintiff had not done their full duty to her as brokers. There was no laches on plaintiff's part, as laches cannot start until the plaintiff has knowledge of the facts, and from that time only may she be chargeable with the delay on the theory of acquiescence and ratification for an unreasonable length of time in not making a demand and return of her securities.

As to the custom which the defendant urged to defeat plaintiff's claim, it is my view of the facts in this case that no such custom as the defendant urges exists which would bind the plaintiff. The defendant has failed to show that plaintiff was aware of any such custom as may exist as to unlisted securities as between the dealers and others familiar with the technical dealing in such securities. Certainly not knowing of any such custom, plaintiff cannot, as defendants urge, be charged with it. Any custom, of which a customer is ignorant, under which the form of the printed slip would in itself and apart from other circumstances allow a broker to buy for himself securities of a customer after a margin call, could have no legal effect, since it would be completely at variance with the relations of the parties, would be contrary to public policy and indeed contrary to the rules of the Stock Exchange. This precise question was presented to the Supreme Court of Massachusetts in *Hall* v. *Paine* (224 Mass. 62), in which the court said (at p. 74): " The present custom permitting one employed as a broker to become the purchaser without notice ' is of such a peculiar character, and is so completely at variance with the relation between the parties, converting a broker employed to buy ' and to sell ' into a principal selling ' or buying ' for himself, and thereby giving him an interest wholly opposed to his duty, that * * * no person who is ignorant of such an usage can be held to have agreed to submit to its conditions, merely by employing the services of a broker, to whom the usage is known, to perform the ordinary and accustomed duties belonging to such employment ' (citing cases)."

This case has been cited with approval in *Helfhat* v. *Whitehouse* (258 N. Y. 274), where Lehman, J., said (at p. 279): " It has been held, nevertheless, that where a broker sells as agent for one customer

to himself as agent for another customer, in accordance with the rules and customs of the exchange, the sale is binding upon both customers. (*Hall* v. *Paine*, 224 Mass. 62.)   Indeed where all orders to buy and sell a particular stock are executed through one specialist in that stock, it is difficult to see how sales can be made otherwise.   In such cases the courts will give effect to the rule if they find it is fair and not opposed to public policy; and in the same case in which the Massachusetts court held that a rule was valid though it permitted a broker to make a contract of purchase and sale as agent for both buyer and seller, it held invalid and against public policy a rule that a broker might as agent sell to or buy from himself as principal, at least where it was not shown that the customer knew of that particular custom or usage.   (See, also, *Robinson* v. *Mollett*, [L. R.] 7 English & Irish Appeals [H. L.], 802; *Irwin* v. *Williar*, 110 U. S. 499.) "

In *Heimerdinger* v. *Schnitzler* (231 App. Div. 649 [1931]) on June 17, 1929, defendant purchased from plaintiffs some (unlisted) Mexican bonds.   The sale was confirmed by plaintiffs' letter reading: " We herewith beg to confirm having sold to you today pesos 20,000 Mexican Silver 5's at 7⅜ net, sellers sixty days."   Thereafter there was no communication between the parties until December 2, 1929, when defendant refused to accept delivery in accordance with the terms of the contract.   Defendant claims that pursuant to the written agreement delivery should have been made within sixty days.   Plaintiffs claim that under the customs and usage of the Mexican bond market the term in the written agreement " sellers sixty days " was a special expression meaning that the seller has the right to deliver the bonds contracted for within sixty days upon giving twenty-four hours' notice to the buyer, and that when the sixty days have expired without delivery having been made, the buyer has the right to give twenty-four hours' notice and demand delivery.   If not delivered within twenty-four hours the buyer may then buy the bonds in at the best price obtainable, charging the seller with any excess in cost.   If, however, no such demand is made, the seller has the right, in accordance with this alleged custom. to make delivery at any time after sixty days, without notice.

Plaintiffs failed to prove that the foregoing custom, even if established, bound the defendant.   Defendant was not a member of any exchange doing business pursuant to this custom.   He was a member of the bar.   He was not shown to have had personal knowledge of such custom, nor, in lieu of such personal knowledge, was the custom shown to have been so general, uniform and well known that the defendant should be deemed to have had knowledge

thereof. (*Rickerson* v. *Hartford Fire Ins. Co.*, 149 N. Y. 307; *Harris* v. *Tumbridge*, 83 id. 92.)

Plaintiff cannot be chargeable with notice not actually given to her by the defendants, by their conduct in sending out a confirmation, without telling her their exact relationship to her and, moreover, the plaintiff cannot be charged with notice to her agent, assuming that the bank was such, which I find is not the case. They were merely custodians under special employment to aid her in the preparation of income tax reports and such other duties as she may from time to time delegate to them, but in general there was no such agency as would bind plaintiff.

The defendants urge that the plaintiff ratified their acts. There is no evidence to indicate or infer ratification. In order to ratify there must be knowledge on the part of the person who is charged with ratification. There was no proof that the plaintiff and her agent, so called by the defendant, had knowledge that the defendants were purchasing for themselves and reaping a profit on the very bonds they had already sold to others, or that the relationship of customer and broker had been changed. In the agreement of plaintiff of August 25, 1931, there was nothing from which the defendants could imply or infer that there was anything except a relationship of broker and customer, nor was there any authority in said agreement whereby the defendants would be authorized to purchase from plaintiff the securities they held, but on the contrary, the guaranty or the agreement which was accepted by the defendants required the defendants in applying the securities so held by them to sell them and to apply the proceeds of such sale to the requirements of the margin account therein referred to. The guaranty given to defendants after the reorganization of their firm in January, 1932, dated March 15, 1932, was identical with the guaranty of August 25, 1931. Thereafter in April, 1932, plaintiff executed and delivered a new form of guaranty which superseded the earlier guaranties and this remained in effect during the entire period in suit.

I find nothing in the guaranties which authorized the defendants to change the status of that of customer and broker to that of dealer and customer. The circular letter sent to the plaintiff on or about December 30, 1931, when the firm of Munds & Winslow was reorganized, describes the business of the new firm quite pointedly as being one of brokers for commission only. It is directed "To the Customers of Munds & Winslow: We take pleasure in informing you that the firms of Munds & Winslow and Potter & Company have been consolidated under the name of Munds, Winslow & Potter, effective January 2. The new firm will

comprise present partners of both firms, and *will conduct a strictly commission business in stocks,* bonds and commodities, with the main office in New York and branch offices in Chicago and Philadelphia." (Italics my own.)

This letter indicates that the defendant was doing a pure commission business undertaken by brokers under the relationship of customer and broker.

Other writings from defendants to plaintiff refer to the transactions as sales for her account, and would have led any reasonable person to believe that defendants were acting as brokers and not as dealers or principals. One of these was the letter of May 28, 1932, sent directly to the plaintiff (in which letter confirmations of alleged purchases by the defendants were inclosed), which reads: " Dear Mrs. Johnson: We enclose herewith confirmations of the bonds *sold for your account* (italics my own) in accordance with the instructions received from Mr. Van Vleck. * * * Yours very truly, Munds, Winslow & Potter."

The confirmations inclosed in this very letter all read: " We confirm *purchase* from you," but notwithstanding the statement in the confirmations, the defendants in their letter said they have " sold for your account." The defendant Allen in his testimony admitted that this letter could only imply that the securities had been sold to outside persons and not purchased by the defendants. The same witness, questioned on cross-examination as to the use of this language in a letter, replied: " I mean there was no reason why I should in a letter point out some particular thing that happened along that line. *I would assume that Mrs. Johnson was entirely familiar with it, which I have always assumed."* (Italics my own.)

It is only fair to defendants to say that there is nothing in the case showing that they are not a firm of good repute; but the law, recognizing the potentialities for injustice in the buying by agents of their principal's property, declares that brokers may not buy the securities of customers without their knowledge. The court, therefore, must disregard any question of motive or lack of motive on the part of defendants, and it has likewise to disregard the defendants' claim that the damage is disproportionate to the infraction of plaintiff's rights. The only answer that may be given to the suggestion that the damages in this case are high, is that the court must presume that defendants knew the law, and if they violated it (and violated the rules of the Stock Exchange) they will have to take the consequences.

Inasmuch as defendants themselves, before buying these securities of plaintiff, had sold them at a profit of some $4,784.28, it cannot

be argued that in violating the legal rule against buying the securities of the plaintiff they were taking any chances of possible loss.

If the plaintiff's testimony is to be believed, and if she was not otherwise notified that defendants were themselves the purchasers of plaintiff's securities, then defendants' next defense, that there was an account stated, cannot avail them, because when the account was stated plaintiff was not aware of the true facts.

Findings and conclusions of plaintiff and defendants have been passed upon and filed.

Submit decision and judgment on notice, in accordance with the opinion and findings.

The clerk is directed to enter judgment in favor of the plaintiff against the defendants individually and as copartners for the sum of $62,916.65, and the clerk of the Trial Part is directed to compute the interest on said amount from August 17, 1934, to the date of entry, and to add said interest to the amount found due the plaintiff as damages. Plaintiff to have taxed by the clerk her costs and disbursements.