UNION BANK OF SWITZERLAND,
Plaintiff,
v.
HS EQUITIES, INC., Defendant.

No. 76 Civil 4378.

United States District Court,
S. D. New York.

June 13, 1978.

Sullivan & Cromwell, New York City, for plaintiff; Francis Carling, New York City, of counsel.

Robert J. Poulson, Jr., New York City, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

This action is brought by Union Bank of Switzerland ("UBS" or "Bank"), a Swiss bank, to recover from the defendant, HS Equities, Inc., successor to Hayden, Stone Incorporated ("Hayden Stone" or "defendant"),[1] who acted as a broker for UBS in the sale and purchase of securities in this country, the sum of $104,435.99 which defendant paid to the Internal Revenue Service ("IRS") as interest equalization tax ("IET").[2] The tax liability arose as a result of transactions executed for UBS upon its order, which in fact were for the account of one of its customers, Gerald Martin Zelmanowitz—an American citizen who engaged in foreign securities transactions through UBS.

The basic facts are not in dispute. Plaintiff maintained an "omnibus" brokerage account identified as AM 0086 with Hayden Stone; that is, UBS executed purchase and sale transactions through Hayden Stone for various of its customers through that single account. Hayden Stone was not advised as to the identity of UBS's customers. Hayden Stone received its instructions with respect to each transaction directly from the Bank, executed the transaction in the Bank's name, and either credited (in the case of a sale) or debited (in the case of a purchase) the omnibus account.

When Hayden Stone executed a transaction at the direction of UBS, it sent a confirmation notice to UBS at or about the time of the occurrence. The notice contained the name of the security, the number of shares purchased or sold, the date of the transaction, the purchase or sale price, and the amount of any broker's commission to

---

1. Jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332.

2. The Interest Equalization Tax Act of 1964, Pub.L.No.88–563, 78 Stat. 809, was enacted in 1964 as part of an attempt to improve the United States balance-of-trade deficit. *See* S.Rep.No.1267, 88th Cong., 2d Sess., *reprinted*

*in* [1964] U.S.Code Cong. & Admin.News 3478, 3478–84. With certain exceptions, it imposed a tax on American purchases of foreign stocks and obligations. The Act, which was repealed by Act of October 4, 1976, Pub.L.No.94–455, 90 Stat. 1814, was Modified in large part at 26 U.S.C. §§ 4911–4920.

be added to the purchase price or deducted from the sale proceeds. Upon receipt of the confirmation notice, UBS would debit or credit, whichever was appropriate, its customer's account. The basis of the Bank's accounting for its customers was Hayden Stone's confirmation notice or confirmation by wire. After transmitting the confirmation notice to the plaintiff, Hayden Stone forwarded any proceeds due to plaintiff to the Chase Manhattan Bank, which acted as UBS's agent in New York.

Monthly statements were sent by Hayden Stone to plaintiff which showed the date, the name of the security, the number of shares, and the price for all purchases and sales in the account for the month. These statements also included the amounts and reasons for all cash charges or deductions in the account for that month. The November 1967 monthly statement sent by Hayden Stone to plaintiff contained cumulative deductions of approximately $104,000 for the IET on various transactions executed upon plaintiff's instructions which pertained to its customer Zelmanowitz. In addition to the foregoing, the parties have stipulated that the monthly statements of account sent by Hayden Stone to UBS with respect to account AM 0086 were not reviewed by the Bank upon receipt. Against that background, we consider the facts upon which plaintiff's claim is grounded.

On October 24, 1967, Gerald Martin Zelmanowitz opened an account with the Geneva branch of UBS. Zelmanowitz deposited at least $100,000 in cash in the account on that date and indicated that he was interested in buying stocks in Europe and Canada and selling them in New York. Jacques Martin, the bank official dealing with Zelmanowitz, initially told the new depositor that the Bank could not undertake such transactions because they would be subject to the IET. However, upon Zelmanowitz's assurance to Martin that he had Internal Revenue Service certificates indicating prior American ownership of securities which entitled him to exemption from the IET,[3] UBS accepted the account and upon Zelman-

owitz's instructions purchased stocks in foreign markets and sold them in New York through its omnibus account with Hayden Stone.

At some point, the IRS began to investigate transactions in various stocks being traded through the omnibus account. In November 1967 an IRS agent visited Robert Kleinberg, then regional counsel in Hayden Stone's legal department. The agent suggested that Hayden Stone look into whether it should be withholding the IET for transactions in five stocks sold through account AM 0086 on behalf of Zelmanowitz. Apparently up to that time, Hayden Stone had not been withholding any amounts from the omnibus account for IET purposes.

The prospect that it might be liable for large sums under the IET caused Hayden Stone to take "unusual" and "drastic" action. In November, Hayden Stone "froze" or stopped all trading in account AM 0086 and also segregated or "blocked" 18¾% of UBS's account to cover taxes which might be due on transactions already completed. Hayden Stone's November 1967 monthly statement to UBS indicated a series of debits for the IET which had been withheld upon previously completed transactions in the AM 0086 account.

UBS informed Zelmanowitz of the blocking of the proceeds in his account during a telephone call by Zelmanowitz from New York to the Bank. Thereafter Zelmanowitz, although he was not Hayden Stone's customer, called upon Kleinberg demanding an explanation for the blockage in the transfer of proceeds from the stock sales. Kleinberg took the position that Hayden Stone had no account in Zelmanowitz's name and that it could only take instructions from UBS concerning the account. Apparently, Zelmanowitz convinced Kleinberg that he was the beneficial owner of the stocks in question and had direct knowledge of the transactions, whereupon Kleinberg informed Zelmanowitz he would have to submit further documentation to avoid

3.  Act of Sept. 2, 1964, Pub.L.No.88 563, § 2(a), 78 Stat. 809, 831 (repealed).

future tax withholding from the proceeds of stock sales. When thereafter Zelmanowitz furnished Hayden Stone the appropriate IRS "validation certificates," Hayden Stone unblocked the account.

The now calm waters again grew turbulent at the instance of the IRS. Sometime in late November or early December 1967, an IRS agent notified Kleinberg that the validation certificates submitted by Zelmanowitz might have been improperly issued and thus if Hayden Stone chose not to withhold the tax it did so at its peril.

On December 1, 1967, the Hayden Stone office in Zurich sent UBS a letter confirming a telephone call of that day which stated:

Dear Mr. Martin,

I informed you today on the telephone that a new investigation through the Internal Revenue Service concerning your trades in various European and Canadian Securities is pending.

I recommended you to bloc an amount equal to the interest equalisation tax in your client's account until further notice. We will not fail to submit to you all details concerning this problem upon receipt of the file from our head office in New York.

Please be assured of our full cooperation with your esteemed firm in order to settle these transactions.

We remain,

Yours faithfully,
Hayden, Stone AG
s/R. Stierli
Manager

At this point, Hayden Stone was in somewhat of a quandary. It sought to maintain its working relationship with UBS but viewed the government's "suggestion" of potential liability as a sword of Damocles. After consultation with outside counsel, Hayden Stone decided to rescind the freeze on UBS's account. Kleinberg testified that Hayden Stone "came to the conclusion . . . that the regulations, or the Interest Equalization Tax law itself, permitted us to rely

on the documents, the validation certificate [presented by Zelmanowitz], and that the fact that the government was suggesting that we rely on them at our peril was not sufficient for us to not accept them at face value." [4]

Zelmanowitz, who incidentally was not called by either party as a witness at the trial, nor was his testimony offered by way of deposition, evidently had gained the confidence of Kleinberg—at least to a sufficient degree so that Kleinberg freely discussed with him transactions in UBS's omnibus account and entrusted Zelmanowitz to make personal delivery of letters from Hayden Stone to the Bank relative to such transactions.

On December 5, 1967, Kleinberg wrote the following letter to UBS, which was hand delivered in Switzerland by Zelmanowitz explaining the recent events and Hayden Stone's conclusions:

Union Bank of Switzerland
Geneva, Switzerland
    Re: Account No. AM–0086
Gentlemen:

During the past week Hayden, Stone Incorporated issued instructions to our Zurich branch office to temporarily block your account and to withhold all funds until further notice. These instructions have now been rescinded and I wish to emphasize that the issuance of these instructions was not meant to reflect upon the integrity of the Union Bank of Switzerland. A full explanation of the events leading up to this unusual action is beyond the scope and intention of this letter.

Without fully setting forth all of the details leading up to our action, suffice it to say that we were motivated by a simple misunderstanding. Our federal tax authorities led us to believe that there was some mistake in the issuance of certain documents to Mr. Gerald Zelmanowitz. When this information was communicated to us we reacted by freezing your account until such time as the facts could be ascertained.

4. Trial Record (hereinafter cited at "T.R") at 62.

We now know that the tax officials were in error and acted in such a way that we had no choice but to issue instructions which have no doubt caused inconvenience both to you and to Mr. Zelmanowitz.

We wish to apologize for the inconvenience which resulted from this misunderstanding. Furthermore, we wish to emphasize that none of the events which transpired during this past week should reflect adversely upon the reputation of Mr. Zelmanowitz. Our drastic action with respect to your account was based solely upon a misunderstanding and our behavior should not be interpreted as indication of any wrong doing or impropriety on the part of Mr. Zelmanowitz.

Our Government has recently enacted new amendments to a complex and unwieldy law which has presented difficult problems to both the tax authorities and brokerage firms. A great deal of uncertainty has resulted since this new law was enacted. Unfortunately, Mr. Zelmanowitz was an innocent victim of the uncertainty which surrounds the administration of this law.

We sincerely hope that you will bear with us until our business practices are adjusted so that future transactions may be handled in a routine manner. We have discussed the possibility of new procedures for handling sales of foreign securities and Mr. Zelmanowitz will give you instructions as to how we may take steps to avoid difficulty in the future.

Once again I apologize for the confusion surrounding this matter and I stress our concern that there be no adverse reflection on the reputation of Mr. Zelmanowitz.

> Very truly yours,
> HAYDEN, STONE,
> INCORPORATED
> s/ Robert I. Kleinberg
> Robert I. Kleinberg
> Attorney

However, the Bank was not convinced by Kleinberg's letter that events were back to normal. Thus it wired Hayden Stone on December 11 requesting information that "operations regarding Mr. G. Zelmanowitz plenty ok. and Union Bank Switzerland fully absolved of all respons[i]bility in fuutur [*sic*] trades." UBS received such confirmation by way of two cables from Kleinberg. The first, dated December 12, 1967, stated: "re your today cable this is to confirm that your acct am 0086 is no longer restricted on our books." The second wire relayed through Hayden Stone's Zurich office on December 28, 1967, reads: "as previously stated acct am 0086 belonging to ubs is not restricted or blocked in any way [what] so ever."

On January 12, 1968, Hayden Stone notified UBS by telex and letter that "all foreign securities, subject to the Interest Equalization Tax Act have been received for your account AM–0086–2–153. The $-proceeds for these trades have been paid, according to your instructions, to the Chase Manhattan Bank, New York, for your account." The amount paid to the Chase Manhattan Bank did not include the $104,-000 previously segregated for potential IET liability.

Almost four months later, on April 29, Zelmanowitz appeared at the Bank in Zurich and again hand delivered a letter from Hayden Stone. The letter, dated April 8, 1968, referred to a pending action in the United States District Court for the District of New Jersey with respect to the IET, and stated, among other matters:

> To our knowledge this action involves only two parties, namely, the Internal Revenue Service and Gerald Zelmanowitz. To our knowledge neither Hayden, Stone Incorporated nor the Union Bank of Switzerland are involved as parties to this action and the issues which are in contention are solely between the federal tax authorities and Mr. Zelmanowitz.

Thereupon Zelmanowitz was permitted to withdraw all but a small portion of his funds in the account. In September 1968 he withdrew the balance and closed out the account.

Following Zelmanowitz's withdrawal of the funds, unbeknown to UBS, Hayden Stone still retained the $104,000 IET withholdings. In February 1969 Hayden Stone paid the $104,000 along with other withholdings to the government pursuant to a government notice of levy.

It was not until almost three years later, in 1972, as a result of an internal inquiry conducted by UBS because of differences in its own records and various brokers used by UBS in the United States, including Hayden Stone, that plaintiff discovered that approximately $104,000 had been carried as a debit item on its AM 0086 account at Hayden Stone relative to the Zelmanowitz transactions. In end result, Zelmanowitz got the $104,000; the government likewise received the $104,000. The issue between plaintiff and defendant is who is to bear the burden of the loss. But before we consider the substantive issue, a threshold question is presented by the defendant's claim that relief is barred by the applicable statute of limitations.

## THE STATUTE OF LIMITATIONS[5]

■ Prior to trial, the defendant moved to dismiss the complaint upon the ground that the essence of its claim is conversion and thus was barred by New York's three-year statute of limitations applicable to conversion actions.[6] In denying that motion, the Court observed:

> plaintiff asserts that a contractual relationship existed and that defendant breached its obligations under that contract. Plaintiff, upon [its] pleading, is

entitled to the six-year statute of limitations on this claim. However, at trial plaintiff will have to prove that defendant breached some contractual duty above and beyond the general duty not to convert another's property, in order to establish a claim that will not be barred by the shorter statute of limitations.[7]

For reasons discussed below, the Court holds that the plaintiff's claim is grounded upon a breach of contractual obligation and is governed by the six-year statute of limitations. However, defendant contends that even if the six-year statute applies, the action is time barred.

The parties are in agreement that the operative date for any breach of contract claim is January 12, 1968—the date that Hayden Stone transferred the proceeds of the November 1967 transactions to the Chase Manhattan Bank minus the Zelmanowitz IET deduction which it withheld. In this circumstance, it would appear that the outer limits for the commencement of any action was January 12, 1974.[8] However, on February 26, 1975, defendant executed an agreement which reads:

### AGREEMENT TO EXTEND STATUTE OF LIMITATIONS

HS Equities Inc. hereby agrees that the six-year statute of limitations with respect to any claims which the Union Bank of Switzerland may have against it arising out of the account of Gerald Martin Zelmanowitz shall be extended to and including June 2, 1975. In agreeing to this extension, HS Equities does not concede that the six-year statute of limitations applies to any such claims, nor does it waive its right to raise a shorter statute of limitations as a defense in the

---

5. The parties are in agreement that New York law applies to this action.

6. N.Y.C.P.L.R. § 214(3) (McKinney 1972).

7. *Union Bank of Switzerland v. HS Equities, Inc.,* 423 F.Supp. 927, 929 (S.D.N.Y.1976).

8. The relevant statute of limitations is N.Y.C.P.L.R. § 213(2) (McKinney 1972).

event that suit is brought by the Union Bank of Switzerland on any such claim.

> HS Equities Inc.
> s/ Bruce E. Baker
> President

It is observed that the agreement was signed more than one year after a breach of contract claim was barred based upon the parties' acknowledgment of January 12, 1968 as the date of accrual of such a claim. The action was not commenced until October 1, 1976, based upon successive extensions of the agreement.

The language of the agreement is clear and unequivocal. It was negotiated and drafted by lawyers representing the parties. The defendant, however, seeks to avoid the force of the agreement's unambiguous language upon a claim that it extended the statute of limitations only as to *existing* claims, and that it did not revive those already barred. In effect, the defendant seeks to redraft the agreement by inserting the word "existing" between the phrase "any claims." But the broad and plain language employed by the lawyers for the parties does not justify this. The agreement, as previously noted, was entered into more than one year after the expiration of the statute of limitations for claims of breach of contract. This suggests an intent by the parties to preserve all claims arising out of Zelmanowitz's affairs to which a six-year statute of limitations applied and to extend the time for commencement of actions upon such claims to the date indicated. The defendant may have second thoughts about the wisdom of its agreement, but the Court can find no reason not to accept its terms as broadly as it is written.[9] The Court holds that the stipulation (and its extensions) render this action timely if plaintiff can establish a breach of contract claim.

As mentioned above, for the six-year statute of limitations to be applicable to its claim, plaintiff must establish a contractual relationship which imposes a duty upon Hayden Stone beyond a general duty not to convert another's property. The defendant argues that no evidence was presented at the trial which established a contract or imposed any special contractual duty upon Hayden Stone. True, no written agreement was presented, nor did plaintiff, as defendant stresses, produce any witness who testified as to specific contractual duties owed to plaintiff. Yet it hardly needs citation of authority for the proposition that acts and conduct of parties ofttimes establish a relationship from which flow duties and rights as readily as if they were set forth in writing. Here the course of dealings between the parties over an extended period of time establishes their relationship and the nature of the duties and obligations flowing from that relationship.

It is undisputed that UBS maintained an omnibus account for transactions of its customers with Hayden Stone and that Hayden Stone served as UBS's broker in the purchase and sale of securities for that account upon orders given by UBS. There can be no doubt that this was a typical customer-broker relationship—an agency relationship.[10] As Judge Learned Hand so tersely put it, "a broker is indeed an agent and as such a fiduciary."[11] Cast

---

9. The lawyers who drafted the agreement take contradictory positions as to what was intended by its terms, but their statements and arguments are not part of the trial record and accordingly are disregarded.

10. *See Leo v. McCormack,* 186 N.Y. 330, 78 N.E. 1096 (1906); *People v. Mercer Hicks Corp.,* 4 Misc.2d 55, 155 N.Y.S.2d 740, 744 (Sup.Ct.1956); *In re Kadar,* 3 Misc.2d 479, 154 N.Y.S.2d 280, 287 (Sur.Ct.1956); New York Jurisprudence, Brokers § 29 (1959).

11. *McMann v. SEC,* 87 F.2d 377, 378 (2d Cir. 1937). ·*See Selcow v. Floersheimer,* 20 A.D.2d 889, 248 N.Y.S.2d 934 (1964); *John J. Reynolds, Inc. v. Snow,* 11 A.D.2d 653, 201 N.Y.S.2d 704 (1960), *aff'd,* 9 N.Y.2d 785, 215 N.Y.S.2d 84, 174 N.E.2d 753 (1961); *People v. Toohill,* 208 App.Div. 174, 176, 203 N.Y.S. 457 (1924); *Lipkien v. Krinski,* 192 App.Div. 257, 263, 182 N.Y.S. 454 (1920); *Haight v. Haight & Freese Co.,* 112 App.Div. 475, 479, 98 N.Y.S. 471 (1906), *aff'd,* 190 N.Y. 540, 83 N.E. 1128 (1907); *Johnson v. Winslow,* 155 Misc. 170, 279 N.Y.S.

in that role, Hayden Stone was under a duty to supervise the plaintiff's account with reasonable care, to keep plaintiff fully advised as to the condition of the account, not to mislead plaintiff as to its status, and not to act in its self-interest at the expense of the plaintiff. In sum, Hayden Stone was required to keep plaintiff fully informed as to material matters that could affect plaintiff's judgment with respect to transactions which were the subject of its account.[12]

■ The duty owing from the broker to the customer is not diminished, as the defendant urges, because the customer is one of the largest banks in Switzerland. The standard is constant and does not vary because of the size, experience or wealth of the customer. These matters may have a bearing when reliance and other factual matters are at issue, but they do not relieve a broker of his basic duties.

■ These duties of the broker flow from the contractual nature of the parties' relationship. Thus the Bank, by alleging a breach of such duties, asserts a claim based upon a duty owed to it above and beyond that imposed by common law. Accordingly, the six-year statute of limitations applies to this action.

## THE BREACH OF CONTRACT CLAIM

■ With these general principles in mind, we examine the acts and conduct of Hayden Stone to determine if it measured up to its duty to keep UBS fully informed of the transactions entrusted to its care as broker or whether by its acts and conduct it misled plaintiff, in consequence of which plaintiff suffered a loss of $104,000.

Plaintiff's essential claim, however variously stated, is that it was not kept fully informed by Hayden Stone as to material matters, and but for confusing and misleading information it received from Hayden Stone, it would not have unblocked Zelmanowitz's account and permitted him to withdraw from its proceeds that were never in fact forwarded by Hayden Stone to UBS's account with the Chase Manhattan Bank. The thrust of its position is that when, on January 12, 1968, it was informed by Hayden Stone that the dollar proceeds of the trades in its account had been paid to the Chase Manhattan Bank, it was led to believe by the letter of December 5 and the Hayden Stone advices of December 12 and 28 (the former of which was in response to a specific inquiry as to the Zelmanowitz transaction, already referred to) that its account was no longer restricted or blocked and that funds so paid to Chase included any prior IET withholdings. Thus when Zelmanowitz hand delivered Hayden Stone's letter of April 8, 1968, the Bank was of the view there was no obstacle to making payment to Zelmanowitz of funds on deposit in his account.

The record here compels a finding that Hayden Stone was in a state of confusion on how to handle the Bank's account once

---

147 (Sup.Ct.1935), aff'd, 246 App.Div. 800, 285 N.Y.S. 1075, aff'd, 272 N.Y. 467, 3 N.E.2d 872 (1936); 1 C. Meyer, The Law of Stockbrokers and Stock Exchanges §§ 39, 40 (1931); New York Jurisprudence, Brokers § 29 (1959).

12. This duty to keep plaintiff fully informed flows from the broker-customer relationship whether characterized as fiduciary or agency. Thus in *Johnson v. Winslow,* 155 Misc. 170, 279 N.Y.S. 147 (Sup.Ct.1935), aff'd, 246 App.Div. 800, 285 N.Y.S. 1075, aff'd, 272 N.Y. 467, 3 N.E.2d 872 (1936), after stating that the broker assumed a fiduciary role with respect to its customer, *id.* 279 N.Y.S. at 159, the court stated that the broker was obligated to "fully inform his customer concerning material facts of a transaction." *Id.* 279 N.Y.S. at 160. Similarly, the Restatement (Second) of Agency § 380 (1958) states that implied in an agency relationship is the duty of the agent to inform the principal of matters "relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have." *See* N.Y. Jurisprudence, Brokers § 30 (1959) ("Generally, a broker is under a duty to disclose to his employer all the material information which he may possess or obtain concerning the transaction involved.").

the IRS appeared on the scene. In the words of Hayden Stone's counsel, who was the best informed person with respect to the IET and who consulted outside counsel, he came to "various conclusions at different points in time as to whether the account ought to be blocked or whether we ought not to block the account." [13] On the one hand, Hayden Stone was concerned that suggested irregularities with respect to the validation certificates it had received from Zelmanowitz might subject it to liability for the tax unless funds were withheld. On the other hand, Hayden Stone sought to temper its actions so as to maintain UBS as a valued customer. In consequence, its actions with respect to the Bank's account reflected a zig-zag course and they must be evaluated accordingly. I am persuaded that Hayden Stone failed to measure up to its duty to keep the Bank fully informed as to material matters it was entitled to know with respect to the Zelmanowitz transactions in the omnibus account.

Several instances establish plaintiff's claim. About December 1, Zelmanowitz transmitted to Hayden Stone, as it had requested, IRS validating certificates, whereupon Hayden Stone rescinded the blocking of the Bank's account. Soon thereafter, Hayden Stone was advised by an IRS agent that the validation certificates that it had received from Zelmanowitz were suspect and may not have been validly issued. Hayden Stone never advised UBS as to this. Additionally, at or about this time, Kleinberg was informed by the officer of Hayden Stone, who was in charge of its International Department, of his suspicions that the Zelmanowitz transactions "must be part of the whole crooked thing that is going on overseas with respect to phony certificates of prior American ownership and individuals capitalizing on the 18¾ percent spread by getting false documentation with respect to securities . . . ." [14] In this instance, too, Hayden Stone failed to

inform the Bank that one of its important officers viewed the Zelmanowitz transactions with suspicion—indeed, that he regarded them as part of a "crooked" operation.

Most significant is the defendant's letter of December 5 to the Bank, which was written after Hayden Stone had decided to rely upon the validation certificates provided by Zelmanowitz and to reactivate the account. As Kleinberg admitted at trial in explaining the circumstances surrounding the letter's composition:

> [T]he Swiss, by their very nature [,] get very nervous when the normal course of business is disturbed by anything that indicates governmental scrutiny or any type of irregularity even being suggested, so that we were concerned that we allay any ideas that they had primarily with an interest in keeping them as customers. So we were trying [in the letter], without getting into elaborate detail, to describe why it was that we had acted as we had in the previous days.[15]

The letter is remarkable, not only for what it states, but for what it fails to state. It unequivocally informs the Bank that Hayden Stone had rescinded the instruction "to temporarily block your account"; that it had been led to believe by the tax authorities there had been some mistake in the issuance of certain documents to Zelmanowitz to which Hayden Stone reacted "by freezing your account until such time as the facts could be ascertained"; and that it now knew "that the tax officials were in error." Then, rather surprisingly in view of its own suspicions about the Zelmanowitz transactions, the lawyer continues that "none of the events which transpired during this past week should reflect adversely upon Mr. Zelmanowitz" and he "stress[es] our concern that there be no adverse reflection on the reputation of Mr. Zelmanowitz." In effect, Hayden Stone vouched, and fur-

---

**13.** T.R. at 42.

**14.** T.R. at 58.

**15.** T.R. at 60.

nished character references, for Mr. Zelmanowitz instead of disclosing all the information that had come to its attention which suggested that the Zelmanowitz transactions were suspect by both the authorities and Hayden Stone itself. So, too, there was the failure to advise the Bank that Hayden Stone was still withholding $104,000 with respect to the Zelmanowitz transactions. This omission takes on added significance in view of the specific inquiry made by the Bank in its cable of December 11 as to the Zelmanowitz transactions. Defendant's duty to plaintiff, its customer, required it to disclose the foregoing, knowledge of which was material to plaintiff in its relationship to Zelmanowitz and the handling of his account.

Based upon the totality of the statements contained in the letter of December 5 and the omission to inform plaintiff of suggested irregularities in the Zelmanowitz transactions, the Bank was justified in concluding not only that its account was no longer blocked or frozen, but that the Zelmanowitz transactions were no longer subject to any withholding of funds. Its position was reinforced when the Bank sought additional clarification from Hayden Stone that the account was unrestricted. In·response to the Bank's specific inquiry, Kleinberg responded with two wires which could only confirm UBS's view that its account indeed was functioning normally, free of restrictions or any tax withholdings. In Kleinberg's emphatic words, the account was "not restricted or blocked in any way [what] so ever."

Thus, when on January 12, 1968 Hayden Stone notified the Bank that it had transferred the proceeds of account AM 0086 to its agent here, Chase Manhattan Bank, UBS had no reason to assume that the funds which had been segregated for possible IET in November 1967 had not been included. It had been lulled into the belief that its account was free and clear and that no problem existed as to the Zelmanowitz transactions.

Defendant contends, however, that the statement in the January 12, 1968 letter from Hayden Stone's Zurich office—"we would like to inform you that we have been advised from our headoffice in New York that all foreign securities, *subject to the Interest Equalization Tax Act,* have been received for your account AM 0086–2–153" (emphasis supplied)—should have alerted the Bank that Hayden Stone was withholding the Zelmanowitz funds. Not only is the reference unclear, but the account included transactions other than Zelmanowitz's and as to which the IET may have been properly withheld. The notification to the Bank omits any specific reference to the withholding of any amount for taxes, whether in the Zelmanowitz or any other transaction. It is also to be noted that Hayden Stone had the validation certificates which Zelmanowitz had presented to it and which exempted his transactions from tax payment. Indeed, as already observed, Kleinberg was of the view that despite the suggestion by IRS representatives that there was some question as to the validity of the certificates, he decided this was not sufficient to deter him from recognizing them; and accordingly he acted upon them in removing restrictions upon the account.

Defendant's breach of its duty to keep the Bank fully informed is exacerbated by the letter of April 8, hand delivered by Zelmanowitz at Zurich on April 29, 1968, at which time the Bank unblocked his account and permitted him to withdraw almost all of his funds on deposit when it was unaware that Hayden Stone had not transmitted to the Chase Manhattan Bank the funds which had been segregated in November 1967 in connection with the Zelmanowitz transaction. In the light of all the information possessed by Hayden Stone, the letter is simplistic in tone. While technically correct that the legal issues in the pending action were "solely between the federal tax authorities and Mr. Zelmanowitz," the omission to state or make any reference to the fact that Hayden Stone continued to retain in its possession the funds it had withheld

in connection with the Zelmanowitz transactions and which it did not remit to Chase Manhattan Bank was misleading. Kleinberg could offer no explanation as to why he sent the letter and had no idea why it was hand delivered by Zelmanowitz rather than mailed. The inference is warranted that Zelmanowitz was determined to get the funds and pressured Kleinberg into not only writing it but permitting him to hand deliver it, thus leading the Bank, based upon its belief that all was well in the account, to make payment to him.

That the Bank at this time genuinely believed that its account was unrestricted and that there was no withholding of any sums by Hayden Stone in connection with the Zelmanowitz transactions is evident from a letter written by the Bank to Hayden Stone a few days after Zelmanowitz was paid, which it is desirable to quote in full:

HAYDEN STONE
25 Broad Street

NEW YORK 10004
U.S.A. / BY AIR MAIL

JM/MQ 418 April 8.68 RIK:es
May 1st. 1968

Gentlemen,

We inform you that we had the visit last week of Mr. Gerald Zelmanowitz. He brought us a letter from you dated of April 8. 1968. We were very surprised to receive this letter after such a long delay, bearing in mind the importance of the matter. Moreover it seems to us a little bit strange to receive your letter through the customer. In fact, if your letter had reached us on time, it would have been possible to unblock our customer's account with us much sooner.

We thank you very much for your cooperation. We have duly noted that this litigation now involves Mr. Gerald Zelmanowitz and the Internal Revenue Service only and that neither Hayden Stone Inc. nor the Union Bank of Switzerland are involved as parties to this action.

Very truly yours,

UNION BANK OF SWITZERLAND

Hayden Stone never answered this letter.

In sum, it was the totality of aforesaid acts, conduct and omissions of Hayden Stone which constituted a breach of its duty to keep the Bank fully informed of material matters that was the proximate cause of the payment to Zelmanowitz and loss to the Bank.

[redacted] Defendant seeks to avert judgment upon the ground that the monthly statements contained information of the Zelmanowitz withholding.[16] It has been stipulated that the monthly statements sent by Hayden Stone to the Bank with respect to account AM 0086 were not reviewed by the Bank upon receipt and that the basis of the Bank's accounting for customers who pur-

16. Defendant relies upon several cases in asserting that receipt of the monthly statements establishes a defense of estoppel, waiver or ratification. *See Ocrant v. Dean Witter & Co.*, 502 F.2d 854, 858–60 (10th Cir. 1974); *Goldenberg v. Bache & Co.*, 270 F.2d 675, 681 (5th Cir. 1959); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 428–30 (N.D.Cal.1968), *aff'd in relevant part*, 430 F.2d 1202 (9th Cir. 1970); *Carr v. Warner*, 137 F.Supp. 611, 615 (D.Mass. 1955) (Wyzanski, J.)

These cases, asserting claims of "churning" or unauthorized transactions, are properly distinguishable. In each case, the plaintiff objected to a course of transactions where each transaction had been clearly indicated by confirmation slips and monthly statements. Unless a doctrine of estoppel, waiver, or ratification is adopted, the customer can wait to see if the transactions result in gain or loss and, if the latter occurs, can attempt to disavow the transactions and hold the broker responsible. *See Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1207 (9th Cir. 1970). Here the customer was unaware of the unauthorized deduction taken from the proceeds of sales that it ordered and accepted. The plaintiff is not seeking to hold a broker liable by playing a wait-and-see game. Finally, none of the cases cited to the Court approaches the circumstances detailed here in terms of the confusing signals that were transmitted to the customer by the broker.

chased or sold securities was the broker's confirmation notices or confirmations by wire. Further, it was not until 1972, as a result of an internal Bank inquiry, that the Bank discovered that approximately $104,000 had been debited to the Bank's account on the Zelmanowitz transaction. However, the Bank's modus operandi with respect to the monthly statements does not exonerate Hayden Stone for its breach of contractual duty. More importantly, the November 1967 monthly statement must be viewed in the context of surrounding and subsequent events. Even if the Bank had reviewed the statement, it would not have been unreasonable for it to assume that it reflected earlier withholdings that were no longer in effect in the light of the statements made by Hayden Stone in the December 5 letter and the two subsequent wires in that month that the account was not restricted in any way.

█ In a further effort to avoid judgment, Hayden Stone urges that UBS is "estopped" from recovery of its loss because allegedly UBS had notice of the contemplated transfer to the government of the withheld funds but took no action to stop it. The only evidence of such notice is a handwritten telephone message found in the files of UBS which states that on January 15, 1969, Hayden Stone notified UBS that the $104,000 was to be transferred to the government. The exhibit was offered without any explanation of who received it, under what circumstances it was received, or what action, if any, was taken with respect to it. Even if such notice is deemed adequate, it does not militate against UBS's right of recovery. The funds were delivered to the government on February 26, 1969, some nine months after Zelmanowitz had withdrawn more than $100,000. The injury to UBS stems not from Hayden Stone's payment to the government in February 1969, but rather from the withdrawal of the funds on April 29, 1968, which was permitted by the Bank because it had not been properly informed as to matters pertaining to the Zelmanowitz transactions.

When in February 1969 Hayden Stone delivered the funds to the government pursuant to the government lien, UBS had suffered its loss: the withdrawal in April 1968 of funds by Zelmanowitz from his account.

Plaintiff is entitled to judgment in the sum of $104,435.99, together with interest.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.