MODERN SETTINGS, INC., and Binder & Binder, as attorneys for Modern Settings, Inc., Plaintiffs,

v.

PRUDENTIAL–BACHE SECURITIES, INC., Prudential–Bache Metal, Co., Inc., Felix McCarthy and Fredric Wasserspringer, Defendants.

No. 83 Civ. 6291 (RLC).

United States District Court, S.D. New York.

Feb. 1, 1989.

Jaffe and Asher, New York City, for plaintiffs; Ira N. Glauber, Gregory E. Galterio, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants; John M. Friedman, Jr., Charles Chasin, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

### I

This, the fifth or sixth occasion we have had to plow the ground in this controversy, see earlier opinions, 602 F.Supp. 511 (S.D. N.Y.1984); 603 F.Supp. 370 (S.D.N.Y.1985); 629 F.Supp. 860 (S.D.N.Y.1986), 83 Civ. 6291, slip opinion dated May 6, 1988 (unreported), [1988 WL 49056], with which familiarity is assumed, may be the penultimate point in the litigation. A hearing on damages is scheduled to follow the instant liability disposition. While the controversy has a long litigation history, a historical summary is not necessary to an understanding of the present disposition.

The claims for determination are whether there was unauthorized trading in Modern Settings' margin account maintained at Prudential Bache Securities ("PBS"); whether liquidation of that account was proper; whether PBS is liable for breach of fiduciary obligation or negligent misrepresentation in misvaluing the account; and whether PBS, which bought from Prudential Bache Metals ("PBM") a receivable from Modern Settings of 1500 ounces of gold in August, 1983, for full value is entitled to set off that claim against any claim in which Modern Settings may prevail against it.

Modern Settings, prior to its declaring bankruptcy on March 25, 1986, was engaged in the manufacture and sale of precious metal findings. Harry Binder was its president and sole stockholder. Modern Settings was the beneficial owner of the PBS account which is of concern to us, and although Bialystock and Bloom Productions, Inc., have been declared rightful owner of the claims we discuss here (see slip opinion, *supra* at 9), we will refer throughout this opinion to Modern Settings as the sole and rightful plaintiff.

PBS is a brokerage firm and a member of the New York Stock Exchange. Charles McCarthy was manager of the PBS branch office in Melville, Long Island. Gary Adornato was a broker employed by PBS at its Penn Plaza branch, and designated account executive of the Modern Settings account, in which capacity he continued when the account and he were transferred to Melville.

PBM is a commodities dealer engaged in the sale of precious metal and is an independent sister corporation of PBS. Frederic Wasserspringer, Executive Vice President of PBM during the period of our concern, is now its President.

In 1982, Modern Settings obtained a substantial recovery on an insurance claim of approximately $2.3 million. With these funds a margin account was opened with PBS. At the same time, this account was used as collateral for consignment of gold from PBM. Pursuant to a gold consignment agreement between PBM and Modern Settings, the latter was required to maintain $900,000 in Regulation T securities in the account as collateral for the gold received from PBM.

Sometime in 1982, Binder met Gary Adornato. He agreed to hire Adornato as his broker. While there is conflicting testimony as to whether Binder gave Adornato discretionary authority to trade in the account, the documentary evidence and credible testimony indicate that Adornato's trading in the account was to be subject to Binder's approval. A letter from Adornato to Binder dated December 2, 1982, on the stationary of Richard Berlin, Vice President and resident manager of PBS's Penn Plaza office, states that the account "shall be under the care and direct responsibility of Gary Adornato, only insofar as he shall be the Account Executive, and shall have discretion only where it is specifically authorized by separate letter or document." Plaintiff's Ex. 3.

Moreover, on the transfer to Melville, McCarthy testified that there were no discretionary accounts in his office. He stated that for a broker to be accorded discretion in handling an account, several layers of approval at PBS had to be obtained and the account would be flagged by special markings—none of which occurred here. He also testified that in a conversation with Adornato, who claimed to have discretionary authority to trade in the account, he asked for proof of that authority but did not recall being furnished with such proof at the time. In testimony at the instant hearing, McCarthy stated that he remembers seeing a power of attorney in July, 1983, granting Adornato discretion. (T. 152) Adornato testified that he did not exercise discretion over the account (T. 349), but he was granted power of attorney at the Penn Plaza office at the end of 1982—beginning of 1983 (T. 350), but on transfer to Melville, the document could not be found. While he did not ask Binder to execute a new power of attorney (T. 352), a new power of attorney was executed in June, 1983 (T. 351) but he does not recall seeing it prior to leaving PBS (T. 352). After this lawsuit was filed, he testified at a deposition that the first time he saw the power of attorney was at an earlier deposition (T. 353). On the new account form for the account, no was checked to the question concerning the power of attorney. (T. 354).

Binder testified that on August 23, 1983, after his account had been liquidated, Lewis Klee, Adornato's assistant, came to him and asked him to sign and predate a power of attorney to keep Klee and Adornato from having a criminal problem. He signed and predated the document because "it was not ['his'] intent to see anybody go to jail." (T. 120–21).

Binder and Klee testified that there were always a number of errors in PBS's rendering of the account. Klee testified that he and Adornato tried to correct the errors before they came to Binder's attention. According to Klee, when the account was at Penn Plaza, Binder would come in daily to go over the account with Adornato and would ask "how much money can I withdraw, how much am I worth, net worth. Those were the two main questions." (T. 224) "He was always concerned with the liquidity of the account." (T. 222) When the account moved to Melville, he did not stop by as frequently, but he wanted to know how much he could withdraw for use in his business.

In June, 1983, Binder met with Adornato and Klee. He told them he was closing down Modern Settings for two weeks, that he needed money to buy gold and wanted to be out of option trading by the time he returned (T. 72, 227). On his return he asked Adornato whether his options with Coleco stock had been liquidated. (T. 74) Adornato answered negatively but said he would have him out by the end of the week. (T. 74) Instead, Adornato got him more deeply involved. (T. 77, 238) Adornato then began to avoid him. (T. 79, 238). Klee was concerned with Adornato's behavior, as was McCarthy (T. 237) who called Klee into his office and told Klee he thought Adornato was going to have a crackup.

In July, 1983, Binder complained to Wasserspringer about Adornato trading in Coleco options in his account. He also complained to McCarthy (T. 163) who had been advised by Wasserspringer of Binder's complaint to him. (T. 160)

The account was misvalued by approximately $300,000 in Modern Settings' favor. Kenneth Ottendorfer, section manager of PBS's margin department, was asked on August 12, 1983, to price the account. (T. 200) He worked the weekend, discovered the $300,000 error, and upon correcting the error, the account became undermargined. (T. 201) According to Ottendorfer, a maintenance call immediately went out but the only record of a maintenance call is one on August 19. With this call, however, is a note that Ottendorfer had sent out the original call and presumably earlier call, but this August 19 call is the only written record of any call going out.

The customer is usually given ten days from the date of the call to comply, which in this instance would be August 29. These calls go, not directly to the customer, but from the margin department to the appropriate branch. McCarthy never saw a written maintenance call.

McCarthy was advised of the misvaluation by telephone while Binder was in his office complaining about Adornato (T. 166). He was surprised and told Binder not to worry, because the firm would make up for it (T. 167). Wasserspringer, on learning of the misvaluation from McCarthy (T. 262), spoke to Binder by telephone on Thursday, August 18 and Friday, August 19 to advise him that the account was undercollateralized in terms of the gold consignment agreement. (T. 265) On August 19, 1983, Wasserspringer wrote and had hand delivered a letter to Binder and his attorney indicating that the account was undercollateralized, and that Modern Settings would have until August 23, 1983, to restore the account to compliance with the gold consignment agreement. "Modern Settings' failure to do so by 2:00 p.m. on Tuesday, August 23, 1983, shall constitute default under the Consignment Agreement and immediate termination of the Consignment Agreement and entitle [PBM] to take whatever action it deems appropriate." Plaintiff's Ex. 17. PBS did not know anything about the gold consignment agreement. It dealt with Modern Settings solely as a margin account.

Binder advised Wasserspringer that he felt there was an error, and that the account was not undercollateralized. (T. 267) He received Wasserspringer's letter on Friday afternoon, August 19. He did nothing with the letter "other than trying to figure out how much gold I would have to return since I didn't have the money." (T. 90) On Monday, August 22, he received a call from Adornato advising him that PBS was liquidating the account. (T. 90). On liquidation, the value of the account was reduced to $130,000 (T. 92). At a subsequent meeting with PBM and PBS people, it was agreed to supply Modern Settings with 1200 ounces of gold. Binder only obtained 405 ounces because the agreement called for delivery of various documents by Binder to PBM. These documents were never delivered. Thus, no additional gold was supplied.

II

The evidence is clear that PBS misvalued the account, and that the act caused Modern Settings injury. It is also clear that PBS wrongfully liquidated the account on August 22, 1983. Wasserspringer of PBM gave Modern Settings until 2:00 p.m. on August 23, to correct the deficiency in the account. PBS's maintenance call gave Modern Settings until August 29. While the evidence is less clear cut than on the other two issues, the proof is sufficient to establish that Adornato engaged in unauthorized trading and that he exhibited to McCarthy sufficient signs of stress to require the branch manager to bar him from access to the handling of any of the accounts in the Melville office.

The error in overvaluing the account came about because PBS failed to debit the account with the payment of principal on GNMA and FNMA securities. The account was carried for several months as if there had been no pay-back of principal. The pay-back amounted to $300,000, which was the amount the account was overvalued.

Defendants argue that Binder is a lawyer and a sophisticated investor and had the means and opportunity by careful scrutiny of the account to ascertain its true

·status. Hence, it is said no reliance could have been placed on PBS's error. It is, of course, settled law in New York that where the facts represented are not peculiarly within the party's knowledge making the representation, and the other party has the means available by exercise of reasonable diligence to ascertain the true facts, he will not be heard to complain that he relied, to his detriment, on the misrepresentation. *Sylvester v. Bernstein*, 283 A.D. 333, 127 N.Y.S.2d 746 (1st Dep't), *aff'd*, 307 N.Y. 778, 121 N.E.2d 616 (1954); accord *Cudemo v. Al and Lou Construction Co., Inc.*, 54 A.D.2d 995, 387 N.Y.S.2d 929 (3d Dep't 1976).

■ However, that argument cannot prevail in this case. Defendants' duty to Modern Settings is not relaxed because of Binder's sophistication. *Union Bank of Switzerland v. HS Equities*, 457 F.Supp. 515, 522 (S.D.N.Y.1978) (Weinfeld, J.). The evidence shows that this was a very heavily traded account. Binder's concern was with the account's liquidity—how much he could use to buy gold. If the account consisted of only the GNMA and FNMA transactions in which the error was committed, defendants' argument would have more force. The yardstick of justifiable reliance is that the conduct be not so utterly unreasonable in the light of the available information that the law may properly say that the loss is the so-called victim's own responsibility. *Corva v. United Services Automobile Association*, 108 A.D.2d 631, 485 N.Y.S.2d 264 (1st Dep't 1985). Binder could not readily ascertain by his own study of the call up of the account in Adornato's office or the mid-month statements sent to him that the figures produced were not correct. Binder's failure to make certain that the figures given out by PBS were accurate did not excuse PBS from its duty to provide accurate information. Binder justifiably relied on PBS to provide him with accurate and up-to-date figures as to the status of his account. *Fund of Funds, Ltd. v. Arthur Andersen*, 545 F.Supp. 1314, 1361 (S.D.N.Y.1982) (Stewart, J.). A bank, supplying data to its customers similar to that in issue here, was held liable for negligent misrepresentation. *De Atucha v. Manufacturers Trust Co.*, 155 N.Y.S.2d 537 (S.Ct.N.Y.County 1956).

PBS held a fiduciary obligation to Binder to provide accurate and reliable information on the financial status of his account. It was on notice through Adornato that Binder relied on the information received to determine the amount of money he could take from the account for business and other purposes. Its negligent misrepresentation caused him to take more funds from the account than he would have had he been aware of the true status of his account.

Even if the defendants' responsibility is not measured by the standard applicable to a fiduciary, there would exist, nonetheless, a duty to provide Modern Settings with correct information. PBS knew or should have known that Binder used the information received to determine the extent of expenditures he could make in his business and that he would rely on the information given. *International Products Co. v. Erie R.R. Co.*, 244 N.Y. 331, 155 N.E. 662 (1927); *Banker's Trust Co. v. Steenburn*, 95 Misc.2d 967, 409 N.Y.S.2d 51, 66–67 (S.Ct.Chautauqua Co.1978); *See also Home Mutual Insurance Co. v. Broadway Bank and Trust Co.*, 100 Misc.2d 228, 417 N.Y.S.2d 856, 860 (S.Ct.Monroe Co.1979). Accordingly, PBS is liable for negligent misrepresentation of the financial status of Modern Settings' account.

Once PBS ascertained the true status of Modern Settings' account, it issued a margin call. The only written margin call produced is one dated August 19, 1983. This call required the deficit to be corrected by August 29. There is no evidence that this call reached the Melville branch or was transmitted to Modern Settings.

Wasserspringer advised Binder on August 18 and 19 by telephone that he was undercollateralized and had a letter hand delivered on August 19 giving Modern Settings until 2:00 p.m. on August 23 to correct the deficit.

■ PBS and PBM, as long as they acted in good faith, had authority to liquidate the account without notice once it was un-

dermargined and undercollateralized. *See e.g., Schenck v. Bear, Stearns & Co.,* 484 F.Supp. 937, 949 (S.D.N.Y.1979) (Motley, J.); *Rex Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985, 992 (S.D.N.Y.1984) (Sofaer, J.); *Geldermann and Co. v. Lane Processing, Inc.,* 527 F.2d 571, 576–77 (8th Cir.1975). Here, however, the right to liquidate without notice was waived by Wasserspringer's letter of August 19, and by PBS's margin call of the same date. *Land Oberoesterreich v. Gude,* 109 F.2d 635 (2d Cir.1940); *Rosenthal v. Brown,* 247 N.Y. 479, 160 N.E. 921 (1928). PBM's notice put the deadline at August 23; PBS's call put it at August 29.

 As the court stated in *Rosenthal v. Brown,* the terms of the customer agreement and the notice on confirmation slips are affected by subsequent promises and courses of action. If a broker waives his right to strict performance and gives time to the customer, he cannot recall this waiver at his own option without first giving notice to the customer. There was no notice to Modern Settings that the August 23 or August 29 deadlines would not be honored, and that a new deadline was being imposed unilterally by PBS. PBS acted on the incorrect theory that it could liquidate the account without notice.

There are no facts before the court to show that immediate liquidation was necessary to protect either PBM or PBS's interest. Indeed, after liquidation PBM advanced even more gold to Modern Settings, which indicates it could have postponed taking action at least until August 23.

Defendants imply that Binder had indicated that he was not going to do anything to correct the deficit and, therefore, they were not required to wait until August 23 to liquidate his account. In taking this position they apparently rely on the doctrine of anticipatory breach of contract.

 There is no credible evidence that Modern Settings was not going to make some effort to correct the deficit by August 23. It is true that Binder was convinced that the statement of his account being undermargined or undercollateralized was an error. He could not believe

that there was a shortfall of over $300,000 in his account, but under the circumstances, such a reaction is understandable. That reaction, however, is not sufficient to bring the anticipatory-breach-of-contract doctrine into play. A positive and unequivocal repudiation of one's contractual obligation is required. *Reprosystem, B.V. v. SCM Corp.,* 630 F.Supp. 1099, 1101 (S.D.N.Y. 1986) (Sweet, J.). Moreover, the doctrine is applicable solely to bilateral contracts, embodying mutual and interdependent obligations. There must be some dependency of performance. Thus, a party who has fully performed (as has PBS and PBM) cannot invoke the doctrine, even if it could be established that Modern Settings in fact rejected the opportunity to provide the necessary margin in and collateralization of its account by August 23. *Long Island R.R. Co. v. Northville Industries Corp.,* 41 N.Y. 2d 455, 463–64, 393 N.Y.S.2d 925, 930–31, 362 N.E.2d 558 (1977). PBS acted prematurely in liquidating the account prior to the August 23 deadline. PBS and PBM are liable for the wrongful liquidation of the account.

 PBS, which now owns PBM's claim against Modern Settings for unpaid for gold, seeks a setoff of that claim against any liability it may owe to Modern Settings. The law seems clear that a setoff is not ordinarily allowable in the circumstances of this case. Where one of the parties is a bankrupt, the debts and credits have to be mutual, and mutuality exists only when the debts and credits are to the same party. *Bayliss v. Rood,* 424 F.2d 142 (4th Cir. 1970); *In re Visiting Home Services, Inc.,* 643 F.2d 1356, 1360 (9th Cir.1981); *Josephine A. Beecher v. Peter A. Vogt Manufacturing Co.,* 227 N.Y. 468, 125 N.E. 831 (1920); *Manchester Insurance & Indemnity Co. v. Manchester Premium Budget Corp.,* 469 F.Supp. 126, 129 (E.D.Mo.1979); *In re Diesel Motors Co., Inc. v. Kaye,* 74 Misc.2d 302, 345 N.Y.S.2d 870, 875 (Nassau Co.1973). For debts to be mutual they must be in the same right and between the same parties, standing in the same capacity. 4 Collier on Bankruptcy (14th Ed.1978) ¶ 68.04[21] at 867.

Moreover, where the liability of the party seeking a setoff arises from a fiduciary obligation, there is lacking the requisite mutuality; thus a setoff is not allowable. *Allegaert v. Perot,* 466 F.Supp. 516 (S.D.N.Y.1978) (Knapp, J.). It is well established that "where the liability of the one claiming the setoff arising from a fiduciary duty or in the nature of a trust, the requisite mutuality of debts or credits does not exist, such a person may not set off a debt owed ... against such liability." 4 Collier, *supra.*

In addition, a subsidiary corporation may not set off a debt owed to the bankrupt against a debt owed by the bankrupt to another subsidiary. *Depositors Trust Co. of Augusta v. Frati Enterprises, Inc.,* 590 F.2d 377 (1st Cir.1979); *Matter of Vehm Engineering Corp.,* 521 F.2d 186, 190–91 (9th Cir.1975).

In *Josephine Beecher, supra,* it was held that this rule is relaxed when necessary to prevent injustice. For the purposes of judicial and litigation economy, the parties have presented most of their claims here. PBS now owns PBM's claim for the gold consigned to Modern Settings. While that claim may be litigated in a separate action, the more reasonable course would be for that claim to be litigated here. Bankruptcy considerations, not present here, may be the basis for the rigidity of the approach when the debtor is a bankrupt, but those considerations are not relevant at this juncture. The claims of Modern Settings, the bankrupt, now belong to Bialystock and Bloom. I think, under the circumstances, pragmatic considerations warrant allowing the set off so all the claims can be resolved.

I am requesting the plaintiff to give further consideration to agreeing to allow PBS to set off its claim against Modern Settings against its liability to Modern Settings in order to bring the litigation to an end. Barring such agreement, I direct the parties to supply me with a further and more extensive exploration of this issue in order for me to determine whether I can require the setoff, even if plaintiff disagrees. A voluntary agreement to resolve the issue will save litigation over the gold claim being pursued in state court.

■ Finally, it is clear that Adornato engaged in unauthorized trading, and the signing and pre-dating of the power of attorney by Binder after liquidation to protect Adornato and Klee against possible criminal penalties was not action with requisite intent to ratify the unauthorized trades. Hence, Adornato's acts were not ratified. *Breen Air Freight, Ltd. v. Air Cargo, Inc.,* 470 F.2d 767, 772 (2d Cir.1972). Ratification of unauthorized trades occurs only when it is clear from all the circumstances that the customer intends to adopt the trade as his own. Knowledge of the pertinent facts and the clear intent to approve the unauthorized action is a precondition to ratification. *Drexel Burnham Lambert, Inc. v. Commodity Futures Trading Commission,* 850 F.2d 742, 750 (D.C.Cir.1988). A failure to object over a long period of time is evidence of acquiescence in the unauthorized activity. *Altschul v. Paine, Webber, Jackson & Curtis,* 518 F.Supp. 591 (S.D.N.Y.1981) (Lasker, J.). There is evidence of a close relationship between Adornato and Binder, but the credible evidence indicates that Binder told Adornato to get him out of the Coleco options. Instead of doing that, Adornato got him more deeply involved. Moreover, the Melville branch manager, Felix McCarthy, was supposed to monitor the activities in the account. It is clear he did not do this. The evidence also establishes that Adornato, during that period, was suffering from great psychological stress. McCarthy was aware of this and indeed remarked on Adornato's state to Klee. Yet he put no brake on Adornato's activities. Although there is no evidence that Binder filed a written complaint with PBS or PBM about his broker, he did complain to McCarthy and to Wasserspringer about Adornato. That was sufficient.

The corporate defendants are liable to Modern Settings for any damage that plaintiff can show it incurred as a result of the unauthorized trading of Adornato, independent of the damages that resulted from negligent misvaluation and unwarranted liquidation of the account.

All claims against the individual defendants were voluntarily discontinued with prejudice.

IT IS SO ORDERED.