Donald Thorp, Plaintiff, v. Gosselin Hotel Company, an Illinois Corporation, Aurora Island Hotel Company, an Illinois Corporation, and Robert W. Robinson, et al., Defendants.
Robert W. Robinson, Counter-Plaintiff, Appellant, v. Donald Thorp, Counter-Defendant, Appellee.

Gen. No. 64–150.

Second District.

November 22, 1965.

Sears, Streit, Dreyer & Foote, of Aurora (William J. Foote, of counsel), for Robert W. Robinson, appellant.

Goldsmith, Dyer & Thelin, of Aurora (David D. Dyer, Jr., of counsel), for Donald Thorp, appellee.

MR. JUSTICE MORAN delivered the opinion of the court.

Counterplaintiff, Robert W. Robinson, appeals from the trial court's judgment order disallowing his counterclaim for real estate broker's commission of $10,000 against Donald Thorp, counterdefendant. Thorp had sued two hotel companies, an attorney and Robinson for fraud and deceit in inducing Thorp to enter contracts to purchase a hotel building from one corporate defendant, forty rooms of furniture from the other corporate defendant and to pay Robinson a brokerage commission of $10,000. Thorp asked the court to declare the contracts null and void and order the return of his earnest money deposit held by the attorney.

The attorney was dismissed before trial, and after a trial on the merits the trial court held in favor of the corporate defendants in the original case and in favor of plaintiff and counterdefendant Thorp on the counterclaim. Plaintiff did not appeal; however, Robinson appeals from the denial of his counterclaim.

On March 11, 1963, Thorp, who described himself as a real estate investor, entered into a contract to purchase the Aurora Hotel in downtown Aurora for $175,000, together with furniture for forty hotel rooms from the Leland Hotel for $60,000. He paid $5,000 down and paid another $5,000 on April 1, 1963. The contract provided for the final $165,000 for the hotel to be paid by May 1, 1963.

Thorp had been approached about purchasing the hotel in January of 1962 by Robinson, and in January of 1963, Robinson mentioned it to him again. The asking price

108

was reported to be $175,000 net to the sellers. In February, 1963, Thorp made a formal written offer to purchase the property for $175,000, which was to include the broker's commission. After this offer was refused he made a second offer of $175,000 net, which was not to include the broker's commission. This was accepted and the contract of March 11, 1963, was prepared and signed and the earnest money was paid.

Subsequently, on March 19, 1963, Thorp entered into a written agreement to pay a broker's commission of $10,000 to Robinson for his services in the transaction.

The March 11, 1963, contract was not made contingent upon Thorp obtaining financing and there was testimony that he stated at that time he already had financing committed.

During March, April and May of 1963, Thorp made certain attempts to obtain financing but without success. He finally defaulted on the purchase contract.

During the trial, Thorp testified that Robinson had acted as his broker in previous transactions; that Robinson had several listings on properties owned by Thorp about which they conferred together regularly; that in January of 1962, when they talked about the hotel property, Robinson told him a member of the Gosselin family had said the net profits of the hotel were around $23,000. Thorp further testified that, prior to entering into the purchase contract, Ward Gosselin told him the profits for two or three years were $23,000 per year. The property had been appraised at about $250,000 or $300,000.

Prior to March 11, 1963, Thorp had never inspected the hotel except to go through the lobby. He had been advised that the plumbing was bad, that the plaster on some of the walls was crumbling and falling, and that there had been a falling out between the various members of the Gosselin family. He stated that Robinson told him that he did not care what the net earnings of the hotel had been because if the hotel could support the three

109

Gosselin families, it could certainly support one family, and that under new management the hotel could earn substantially more than it had in the past.

On cross-examination, Thorp admitted that he had used the figure of $22,000, rather than $23,000 at the discovery deposition; that he had stated at the deposition that he did not recall asking for a statement of earnings of the hotel prior to March 11, 1963, and that he did not recall hearing the Gosselins say anything about net earnings before March 11, 1963.

Frank Muneio, an officer of one of the lending institutions to which Thorp applied for a loan, testified that Thorp told him the purchase price was $250,000, and the net earnings were approximately $5,000.

William Ward Gosselin testified that no net earnings figures were mentioned in the negotiations and Thorp never asked for any such figures. He thought Thorp was acting for another undisclosed purchaser because of his lack of interest in the earnings of the hotel. An offer was made to Thorp that he could look at the hotel books and records, but he did not avail himself of the offer.

It further appears that on May 4, 1963, Thorp received a letter from John Gosselin stating the income to be about $5,000, and later on or about May 15, 1963, at Thorp's request, Robinson wrote a letter. In this letter he stated that in the first part of 1963, John Gosselin gave him various figures including the figure of $21,311.00 as "new" income per year from 1960 to date.

Thorp admitted several times during his testimony that he had understood Robinson to have been only relaying net income figures given him by Gosselin.

The trial court wrote a memorandum of opinion in which it held that although Robinson acted in good faith as Thorp's agent, he failed to use ordinary care in determining the actual profits of the real estate, he gave no advice as to a proper inspection of the property, and that there is no proof that he actually made a thorough

110

inspection of the property himself. The court held that because of prior dealings between Thorp and Robinson, Thorp relied upon the broker's knowledge and experience in the real estate field. Further, that the agency agreement should be strictly construed against the agent, and therefore the agreement was not enforceable by the agent. The trial court also held that the agent was not entitled to the reasonable value of his services.

Appellant, Robinson, argues that this decision is not based on the pleadings or evidence offered under the pleadings; that a broker is not under a legal duty to act as an advisor or consultant to a purchaser; and that he owed no duty to obtain income information or insist that Thorp inspect the property. Appellant contends that he earned his commission upon bringing together a ready, willing and able buyer and a seller who accepts the buyer and a contract is executed.

It is clear from the evidence that Robinson was acting in behalf of Thorp in this transaction. As Thorp's agent, Robinson owed him the duty of exercising reasonable care, skill and diligence. Generally speaking, a principal has a right of action against his agent for loss or damage resulting from the agent's breach of duty or wrongful act. Failure to exercise due care, with resulting damage to the principal, will when properly pleaded and proved, preclude a broker from compensation for his services. However, the simple failure of the principal, because of financial inability to consummate the transaction does not discharge his obligation to compensate the agent.

It is true, as suggested by appellant that there were no allegations either in Thorp's complaint or in his answer to appellant's counterclaim raising the question of due care on the part of Robinson. Indeed, in the complaint Thorp charged Robinson, "as agent and broker for the corporate defendants," with falsely and fraudulently representing to Thorp that the net income of the hotel was

$21,311 per year; whereas, his answer to the counterclaim is nothing but denials of the allegations of the counterclaim.

■ However, it is not necessary to base our decision on the pleading question. We hold rather that in this case the broker had no duty to his principal to explore the question of the sellers profits from the operation of the hotel nor was he under any duty to advise Thorp to inspect the property nor to completely inspect the property himself. Net income from the operation of a hotel business depends upon many factors besides the value of the land and improvements thereon. Elements of good management, payrolls and other overhead expenses and methods of accounting may affect net income more than real estate value. Both parties were apparently of the opinion that for various reasons Thorp would be more successful in the operation of the hotel than were the sellers. In addition, it was recognized by both parties that the building was in a rundown condition; that extensive plastering and plumbing work had to be done, and that a new boiler was needed.

Further, we find no causal relation between the acts or alleged omissions of Robinson and Thorp's failure to complete the purchase. Thorp was experienced in real estate matters. He spoke repeatedly with the Gosselins and had a full opportunity to request financial records or inspect the premises as he wished. The price of $175,000 was certainly fair, since the only proof of any other value was the appraisal of $250,000. Thorp represented the purchase price to be $250,000 when he talked to Frank Muneio, and there is no proof that he ever advised any lending institution that the purchase price was only $175,000. Whatever the cause of Thorp's failure to complete the purchase, it was not the result of fault on the part of Robinson.

The cause is reversed and remanded to the trial court with instructions to enter judgment in favor of Robinson on the counterclaim for $10,000 and costs.

Reversed and remanded.

ABRAHAMSON, P. J. and DAVIS, J., concur.