**In re THOMSON McKINNON SECURITIES, INC., Thomson McKinnon, Inc., and Realty International Corporation, Debtors.**

**Bankruptcy Nos. 90B10914, 90B11805 and 90B13820.**

United States Bankruptcy Court, S.D. New York.

Aug. 27, 1992.

See also 141 B.R. 559.

Saiber Schlesinger Satz & Goldstein, Newark, N.J. (Sean R. Kelly, of counsel), for debtors.

Hannoch Weisman, P.C., Roseland, N.J. (Robert C. Epstein, of counsel), for F.D.I.C.

DECISION ON MOTION FOR AN ORDER TO ESTIMATE CLAIM OF FEDERAL DEPOSIT INSURANCE COMPANY

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

The Federal Deposit Insurance Corporation ("FDIC") has commenced this estimation hearing pursuant to 11 U.S.C. § 502(c)(1) with respect to its contingent and unliquidated claim against the Chapter 11 debtor, Thomson McKinnon Securities, Inc. ("TMSI"), for losses incurred in a portfolio of 1116 mortgage loans purchased in 1983–1984 by Lincoln Federal Savings and Loan Association ("Lincoln"). Lincoln was a savings institution located in New Jersey which became insolvent and, under federal regulatory supervision, its assets were sold and the institution was dissolved. FDIC is the successor in interest to Lincoln and is the holder of Lincoln's claims against TMSI for losses incurred in Lincoln's mortgage portfolio. TMSI acted as the broker in the sale of the mortgage loans to Lincoln.

This controversy had been actively litigated in the United States District Court for the District of New Jersey for several years prior to the debtor's Chapter 11 filing with this court on March 28, 1990, and an extensive record was developed. In the course of the litigation in the district court in New Jersey, partial summary judgment was granted in favor of the debtor against Lincoln, dismissing all of Lincoln's securities claims, state and federal, on the ground that the sales of "whole loans" did not involve transactions in "securities." The only claims remaining are New Jersey common law claims for fraud and negligent misrepresentations.

FDIC contends that Lincoln was induced to purchase the mortgage loans by the debtor's fraudulent and/or negligent representations. Prior to its dissolution, Lincoln commenced a suit in the state court in New Jersey against the selling corporations and the insurance company which provided mortgage insurance. Lincoln alleged that a substantial amount of the $31 million in loans it had purchased was expected to go into default and the sellers and the insurer

had breached their duties as sellers and insurers of the loans. The state court suit was ultimately settled and Lincoln received partial compensation for its losses in the sum of $16,250,000.00. Additionally, Lincoln received a consent judgment from one of the sellers for $1,884,121.97. FDIC seeks to estimate the balance of Lincoln's losses against the debtor, which disclaims any liability in its capacity as broker or "matchmaker."

## FINDINGS OF FACT

1. The debtor filed with this court its liquidating Chapter 11 case on March 28, 1990 and was continued in operation of its business and property as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2. Lincoln was a savings and loan association located in Westfield, New Jersey. James P. Messersmith ("Messersmith") was a senior vice president and a director of Lincoln. James Fehon ("Fehon") was a vice president and in charge of Lincoln's Consumer Loan Department.

3. The debtor was a New York-based brokerage firm primarily engaged in brokering the sale and purchase of securities. William W. Bartlett ("Bartlett") was a vice president of the debtor from 1979 until 1984 and was in charge of the Mortgage Services Department. Michael A. Martin ("Martin") was a broker in the debtor's office in Memphis, Tennessee.

4. CES Capital Corporation, CES Service Corporation and CES Capital Corporation d/b/a Guaranty Loan Plan (collectively "CES") are a group of related Texas corporations which were engaged in the sale, service and origination of mortgage loans. CES is currently in bankruptcy proceedings in Texas. William Holeman ("Holeman") was the president of CES. William Strickland, Jr. ("Strickland") was a vice president of CES until March, 1983, when he formed Republic Funding, Inc. ("RFI"), an Oklahoma corporation engaged in the same business of selling, servicing and originating mortgage loans as CES. Strickland continued after 1983 to perform consulting

services for CES. Strickland was also a principal of HIS Investments, a mortgage broker performing substantially the same services as RFI.

5. Beneficial Corporation ("Beneficial") is the parent of a number of insurance companies which provide mortgage default insurance, including Beneco Holding Company ("BHC"), American Centennial Insurance Company ("ACIC") and Service General Insurance Company ("SGIC").

6. CES represented to Lincoln that CES was an agent appointed by Beneficial with authority to place credit default insurance on loans originated and sold by CES. Thus, Lincoln was informed and aware of the conflicting position occupied by CES as both the originator of the mortgage loan and an authorized agent to place credit default insurance on the loans CES originated. According to William Donovan, the TMSI Director of Mortgage Finance, TMSI never learned that CES also acted as an agent for Beneficial and was authorized to write insurance for the loans it originated.

7. Prior to May of 1983, Lincoln engaged in the purchase of insured second mortgages from entities other than CES or RFI.

8. In the Spring of 1983, TMSI decided to enter into a new line of business apart from its activities as a national securities broker. In addition to its sale of securitized mortgages, such as GNMA'S, which represent an undivided interest in an overall pool of mortgage loans, the new department was to broker the sale of "whole loans" which differ from securitized mortgages in that whole loans represent a discrete mortgage debt of a specific borrower. The impetus for this new line of brokering the sale of whole loans was the belief that TMSI was already a top street dealer engaged in retail brokering of securities and that its contacts and relationships with established accounts could be tapped to promote the sale of the whole loans by the new department. TMSI's reputation as a securities broker could give it an advantage over existing mortgage brokerage companies because TMSI could use its existing channels and relationships to sell the new line of whole loans.

9. TMSI developed a marketing plan for the new whole loan department which was to use existing relationships and contacts to solicit and promote the sale of whole loans. TMSI's home office personnel for the new unit consisted of competent and capable people who were familiar with the sale of mortgage loans. The home office undertook a training program to educate its brokers employed by the new unit in the sale of whole loans.

10. In mid–1982, Martin, TMSI's broker in its Memphis, Tennessee office, learned of CES through a mortgage bankers' directory. Martin made a "cold canvass" call to CES to inquire whether CES had any mortgage loans to sell. Either Strickland or Holeman at CES informed Martin that CES was interested in selling mortgage loans on residential properties located throughout the country. CES told Martin about the whole loans and that the loans were "100% insured," in that they were covered by "default insurance." Martin understood that "default insurance" meant that there was no need for the mortgagee to foreclose and that once a loan was in default, it would be paid off.

11. Martin did not know who did the credit underwriting for the loans. Martin did not ask to review the insurance policies nor did he receive any previous instructions from TMSI to review the insurance policies. Neither Martin nor TMSI had ever previously dealt with CES with respect to mortgage loans. Martin had no knowledge as to the specifics of credit insurance and CES did not explain the insurance features to him.

12. After speaking with CES, Martin phoned Messersmith, a Lincoln loan officer. Martin knew of Lincoln's interest in purchasing loans in the secondary market because he had previously dealt with Lincoln, although no deal had ever been consummated. Messersmith informed Martin that Lincoln was interested in purchasing residential mortgage loans. Martin told Messersmith that CES had residential mortgage loans to sell and that the mortgage

loans were covered by 100% default insurance. He never explained what that term meant because, as he testified, CES never explained to him what that meant. Martin did not tell Messersmith about the financial history of CES because he did not know much about CES. He never saw any CES financial statements nor did he credit check CES's history. Martin simply told Messersmith what CES had told him about the mortgage loans.

13. In his conversation with Messersmith, Martin did not try to persuade Lincoln to purchase the mortgage loans offered for sale by CES, nor did he recommend that Lincoln should purchase them. He testified that there was no way for him to persuade Lincoln to buy the mortgage loans because the Lincoln loan department made that decision on its own. He testified that he really did not get to sell Lincoln anything. He simply conveyed to Lincoln the basic information given him by CES, namely the total dollar amount of the package, the interest rates on the loans, the location of the residential properties and the fact that the loans were covered by "100% default insurance."

14. The Lincoln representatives were interested in reviewing the mortgage loans that CES offered for sale and asked Martin to have CES forward to Lincoln written information about CES and about the loans, including a copy of the insurance policy. Martin then informed CES of Lincoln's interest and requested CES to forward the requested items directly to Lincoln. Martin never saw any of the documents that CES and Lincoln passed between each other. From the time that Martin put the seller, CES, in touch with the potential purchaser, Lincoln, Martin took no further role in the negotiations between CES and Lincoln.

15. Fehon, Lincoln's loan officer, testified that it was Lincoln's practice to review the loan files submitted to Lincoln for purchase. It was not Lincoln's responsibility to perform the underwriting function and investigation as to the loans purchased because all underwriting was performed by Beneficial, the insurance company, and

CES, the seller. Each loan file contained a certificate reflecting that the loan was approved for default insurance.

16. Fehon testified that Martin did not discuss any of the terms of the insurance policy other than to identify the name of the insurance company. Fehon said that he understood that each loan would be 100% insured against default. After actually reviewing the insurance policy forwarded by CES, Fehon said he did not draw any contrary conclusions. Fehon was not sure whether it was Martin or a CES representative who told him that default insurance meant that once an account was ninety days delinquent it would be repurchased or paid off by the insurance company.

17. The insured loan packages which TMSI solicited Lincoln to buy were unique for Lincoln, in that these were only loans involving *default* insurance as opposed to *private* mortgage insurance. Lincoln relied on one of the key features of the default insurance, namely that the insurance company or its agent, CES, did the underwriting and credit checking as to the loans covered. This point was important to Lincoln because all of the loans originated outside of New Jersey, where Lincoln was located. Lincoln may have been informed by CES that no further underwriting by it was required. However, there was no credible proof that any representative of TMSI ever made such a statement.

18. The only review performed by Lincoln was to assure that the loan packages forwarded by CES included the proper documents such as the insurance certificates. Additionally, Fehon telephoned Cliff Knapp, an acquaintance of his at Beneficial, and questioned him about the default insurance policy. Knapp informed Fehon about the insurance policy and that CES had a good working relationship with Beneficial. Fehon and other Lincoln representatives also had conversations with CES before the initial purchases were made.

19. A proposal to purchase loans from CES was presented by Messersmith to the Loan Committee of Lincoln's Board of Directors and approved on May 3, 1983. On

May 10, 1983, Lincoln and CES entered into the Whole Loan Sale and Servicing Agreement ("CES Sale Agreement"). On May 10, 1983, Messersmith also signed an SGIC Application for Issuance of a Master Policy of Insurance ("insurance policy"). The insurance policy was issued on the same date. On May 9, 1983, Messersmith signed the first Commitment Letter from CES setting forth the terms and conditions for Lincoln's purchase from CES of a package of $2,000,000.00 worth of mortgage loans. On December 14, 1983, Lincoln entered into a second Whole Loan Sale and Service Agreement with CES and RFI jointly as sellers, identical in its terms to the CES Sale Agreement. Lincoln ultimately purchased 19 separate packages of loans from CES and RFI through 1985 in an aggregate amount of approximately $31,000,000.00. In at least five instances, TMSI sent Confirmation Letters to Lincoln confirming Lincoln's agreement to purchase a package of loans from CES or RFI. Also, each time TMSI was advised of a sale from CES or RFI to Lincoln, TMSI sent a Fee Letter to the seller to remind the seller of the brokerage commission to which TMSI was entitled. In connection with the various sales of packages of loans to Lincoln, TMSI was paid brokerage commissions of varying amounts. The brokerage commissions received by TMSI were then split with the co-broker on the transactions, HIS Investments. All brokerage commissions paid to TMSI in connection with the sales of Lincoln were paid by CES or RFI; TMSI received no payment from Lincoln. Eventually, several loans purchased by Lincoln from CES/RFI went into default and claims were submitted to Beneficial for coverage. In February 1985, SGIC cancelled the insurance policy to Lincoln. In March 1985, after paying the earliest claims, SGIC began denying coverage for defaults on the loans purchased by Lincoln from CES and RFI, citing policy provisions concerning, *inter alia*, notice of default and credit checking requirements. On April 12, 1985, Lincoln's general counsel wrote to Beneficial's general counsel, asserting that the grounds proffered by SGIC for denying Lincoln's insurance claims were "frivolous" and requesting that the issue be resolved before Lincoln took "further action." On July 1, 1985, Lincoln filed suit against Beneficial and CES/RFI in New Jersey state court. On August 30, 1988, the state court suit was settled as to the Beneficial defendants with Beneficial paying to Lincoln insurance proceeds in the amount of $16,250,000.00. On November 15, 1988, Lincoln and RFI entered into a Consent Judgment in the New Jersey state court action in favor of Lincoln for $1,884,-121.97, but Lincoln has had no recovery on that Consent Judgment. Lincoln has filed a claim against CES in the bankruptcy proceedings in Texas, but has had no recovery on that claim.

20. There is no question that Lincoln knew that TMSI contacted Lincoln as a broker of whole loans and not for the purpose of purchasing securities. In the course of the litigation of this matter in the United States District Court for the District of New Jersey, it was ruled that the "whole loans" in question do not involve transactions in securities. However, it is clear from the testimony of TMSI's representatives, William Bartlett, Johanna Ferry and William Donovan, that TMSI touted its reputation as a national securities broker and concluded that this status afforded TMSI an attractive opportunity to exploit the business of brokering whole mortgage loans on residential property. In the course of soliciting securities business, Martin had forwarded to other Lincoln representatives a copy of TMSI's financial statement. Nonetheless, Bartlett testified that in selling whole loans, TMSI merely acted as a conduit of information between potential buyers and potential sellers, who would complete the transactions themselves. In the role as a broker of whole loans, Bartlett and TMSI would not analyze the products as a security broker would analyze the securities market. Martin testified that he was simply a messenger, putting sellers of mortgage loans together with buyers of mortgage loans.

21. The experts for both parties agreed that a typical mortgage broker acts as a matchmaker between potential sellers and

potential purchasers of mortgage loans, passing along information from one to another. A mortgage broker, unlike a securities broker, is not expected to perform due diligence functions, whereas a purchaser of securities looks to the broker and the issuer in preparing the offering and the prospectus.

22. The experts disagree as to whether, on the facts in this case, TMSI went beyond its role as a mortgage broker in dealing with Lincoln. TMSI's expert opined that TMSI performed its function as matchmaker in a reasonable way, consistent with a mortgage broker's customary function, whereas Lincoln "fell apart" in its due diligence function in failing to test out CES's operation, failing to know the economic area in which the loans were made, and failing to review thoroughly the insurance contract. FDIC's expert agreed that it is not typical of a mortgage broker to advertise its expertise in the securities market. However, there was no proof that TMSI advertised its expertise as a securities broker in bringing about the mortgage loans deals in question. There had been no securities transactions between Lincoln and TMSI prior to the mortgage transactions in question. TMSI forwarded its financial statement to Lincoln in connection with a potential securities opportunity unrelated to the mortgage loans involved in the instant matter. There was no evidence that any TMSI representative advised Lincoln that because TMSI was also a nationally known securities dealer that Lincoln could look to TMSI's financial backing in connection with Lincoln's purchase of whole loans from CES.

23. On the other hand, FDIC's expert concluded that TMSI played an expanded role with Lincoln beyond that of a typical mortgage broker because by representing that the loans were covered by 100% default insurance, TMSI was implying that they were risk free. The fact TMSI split its commissions with RFI was unusual, because this act gave the appearance that TMSI was aligned with the seller rather than being independent. The transmitting of a financial statement by TMSI to Lincoln gave the appearance that TMSI professed experience in the fixed income industry. The conflict of interest arising out of the fact that CES also acted as underwriting insurance agent was also a fact that FDIC's expert believed it should have brought to Lincoln's attention by TMSI. However, the parties stipulated that CES represented to Lincoln that CES was an agent appointed by Beneficial with authority to place credit default insurance on loans originated and sold by CES.

24. FDIC's expert concluded that TMSI should have had some understanding of the insurance program involved in this case, the quality of the mortgage loans sold by CES, and reasonable knowledge of CES's experience and capabilities. He also concluded that TMSI's home office, which was capable and experienced in mortgage transactions, failed to monitor its field representatives, including Martin, who was not knowledgeable as to whole loans.

25. There was no evidence that TMSI made any negligent misrepresentations to Lincoln, even if TMSI purported to exercise the skill and competency of a securities broker rather than a mortgage broker. The statement that the mortgage loans were covered by "100% default insurance" was totally correct. Indeed, Beneficial proceeded to pay the earliest default claims on the loans purchased by Lincoln from CES and RFI until Beneficial thereafter asserted certain technical provisions allegedly breached by Lincoln, including notice of default and credit checking grounds. TMSI never guaranteed that Beneficial, the insurance company, would not renege on its contractual obligation under the insurance policy. Indeed, Lincoln previously concluded that "100% default insurance" did apply to the transaction and that Beneficial acted improperly when it failed to pay as agreed. In Lincoln's amended complaint against Beneficial in the Superior Court of New Jersey it alleged:

> The current position/defense by the Beneficial defendants, and their attempt to cancel the Master Policy are spurious— not based upon *bona fide* factual or legal grounds, but on information and belief are a pretext or sham prompted by busi-

ness problems or reverses within the Beneficial organization, including a history of losses in the credit default insurance business, and are related also to efforts by the dominant Beneficial defendants to sell or discontinue that line of business.

Manifestly, TMSI cannot be held accountable for Beneficial's alleged improper motives for failing to honor the "100% default insurance." Indeed, Beneficial's settlement payment to Lincoln in the sum of $16,250,000.00 lends credence to the position that TMSI accurately described the insurance policy covering the mortgage loans sold to Lincoln by CES, although the settlement between Lincoln and Beneficial reduced the percentage that Beneficial was obligated to pay.

26. Even if TMSI should have been more familiar with the terms of the insurance policy covering the mortgage transactions in question, and even if TMSI should have been more knowledgeable as to the credit worthiness of the whole loans sold by CES and the financial history and capabilities of CES, TMSI cannot be charged with having negligently misled Lincoln or fraudulently induced Lincoln into purchasing the mortgage loans from CES. TMSI did not undertake the duty of underwriting the insurance policy or the insured loans, and Lincoln was well aware of this fact. TMSI was not a guarantor of Beneficial's performance under the insurance policy, nor was TMSI a guarantor that the mortgages would not go into default. TMSI had no duty to investigate the quality of the loans or the terms and conditions of the insurance policy. TMSI's duty as a mortgage broker was simply to inform Lincoln fully as to all material facts which came to its attention, including the fact that an insurance policy was issued by Beneficial as to defaults under the mortgage loans sold by CES.

27. In the instant case, TMSI acted as a mortgage broker and not as a securities advisor. TMSI had a duty to act in good faith toward Lincoln and not to act in any manner inconsistent with its duty. TMSI's duty to describe the transactions to Lincoln did not extend to peripheral matters such as the terms and conditions of the insurance policy which was available for Lincoln's review, or the credit worthiness of the mortgage loans offered for sale by CES. The information conveyed by TMSI to Lincoln correctly described the mortgage transactions and brought Lincoln and CES together to investigate and negotiate the details. TMSI was not a party to the negotiations between the parties nor was it furnished with any documentation by Lincoln, nor was it requested by Lincoln for any advice or information after CES and Lincoln were brought together. As a prudent purchaser of mortgage loans, Lincoln may not transfer to TMSI the obligation of due diligence, including reviewing the insurance policy and examining the terms, conditions and location of the loans which it purchased.

28. TMSI's status as a recognized securities broker and its attempt to exploit its securities contacts for the purpose of developing a business in the field of brokering whole loan mortgages does not impose additional responsibilities on TMSI not shouldered by typical mortgage brokers because TMSI did not purport to act as a securities broker. There was no credible evidence that Lincoln believed that TMSI acted in any capacity other than a typical mortgage broker whose function as a matchmaker is to bring a potential seller of mortgage loans and a potential buyer of mortgage loans together to negotiate and consummate a transaction without any further involvement of the mortgage broker other than to confirm the sale and seek to collect the brokerage fee involved.

29. FDIC has failed to establish its causes of action against TMSI by a preponderance of the evidence. Accordingly, because TMSI is not liable to Lincoln for the claims asserted, the issue of damages is moot and will not be addressed.

## DISCUSSION

The FDIC, as successor to Lincoln, seeks in this estimation hearing pursuant to 11 U.S.C. § 502(c)(1), to establish its unliquidated claim against the debtor TMSI for

losses incurred in purchasing 1116 residential mortgage loans from CES. TMSI acted as the broker in the transactions in question.

Under 11 U.S.C. § 502(c)(1), the court must estimate any contingent or unliquidated claim which would cause undue delay in the administration of a bankruptcy case. The estimation process is an expedient method for setting the amount of a claim that may receive a distributive share from the estate. *Addison v. Langston (In re Brints Cotton Marketing, Inc.)*, 737 F.2d 1338, 1341 (5th Cir.1984); *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135–37 (3d Cir.1982); *In re Interco, Inc.*, 137 B.R. 993, 995 (Bankr.D.Mo.1992). In estimating the claim, the bankruptcy court should use whatever method is best suited for the circumstances. *Brints Cotton Marketing*, 737 F.2d at 1341. In the instant case, the parties agreed that each side would submit one live witness and the relevant depositions of witnesses who were examined during the course of the past several years in previous litigation with respect to the mortgage loans in question.

FDIC maintains that TMSI's conduct should be viewed not simply as a typical mortgage broker, who merely acts as a matchmaker, but as a national securities broker dealer because TMSI traded on its reputation and contacts as a securities broker and exploited its established securities relationships. Therefore, FDIC reasons that TMSI held itself out not as an ordinary mortgage broker, but rather as a national securities broker dealer. The distinction is important because a securities broker owes a higher duty of responsibility to its customers to perform an investigation of the investment and to inform the customer of the attendant risks. *Hanly v. Securities and Exchange Commission*, 415 F.2d 589, 595–97 (2d Cir.1969). A securities broker who makes a recommendation is viewed as making an implied representation that the broker has adequate information on the security in question for forming the basis of the opinion. *Franklin Savings Bank of New York v. Levy*, 551 F.2d 521, 527 (2d Cir.1977). A securities broker

cannot deliberately ignore that which the broker has a duty to know and recklessly state facts about matters of which the broker is ignorant because "reliance is not an element of fraudulent misrepresentation in this context." *Hanly*, 415 F.2d at 596.

The facts in this case reflect that TMSI did trade on its reputation as a securities broker, but that in its dealings with Lincoln, TMSI acted only as a mortgage broker and did not purport to act as a securities broker. The fact that TMSI mailed a copy of its financial statement to other people at Lincoln in connection with an unrelated securities activity did not thereby transform the transaction in question to one which involved the purchase and sale of securities. There was evidence that TMSI never previously dealt with Lincoln as a securities broker. Indeed, the only other previous contact TMSI had with Lincoln involved an unconsummated mortgage transaction where TMSI acted as a mortgage broker. Accordingly, TMSI's responsibilities to Lincoln in this case must be viewed from the position it did occupy, namely that of a mortgage broker.

In choosing the applicable substantive law, both parties agreed that New Jersey law controls the claims in question. This point is correct because the claims for common law fraud and negligent misrepresentations, as asserted by FDIC, are governed by the law of the state where the damages were allegedly suffered and the misrepresentations were allegedly made. Restatement (Second), Conflicts of Law § 148(1). In the instant case, the substantive law of New Jersey applies to the claims asserted by FDIC on behalf of Lincoln.

### Fraudulent and Negligent Misrepresentation

Under generally recognized common law principles, a negligent misrepresentation is defined as follows:

An incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for eco-

nomic loss or injury sustained as a consequence of that reliance.

. . . .

... The statement need not be a factual report, but may consist of an expert opinion. Justification for the imposition of a duty of care upon the speaker is found in the respective positions of the one making the representation and the relying party, the former purporting to exercise the skill and competency compatible with his profession or calling, the latter openly placing his faith on such reputed skill. There must be knowledge, or reason to know, on the part of the speaker that the information is desired for a serious purpose, that the seeker of the information intends to rely upon it, and that if the information or opinion is false or erroneous, the relying party will be injured in person or property.

*H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 334, 461 A.2d 138, 142–43 (1983) (citation omitted).

In the instant case, TMSI's representative, Martin, telephoned Lincoln as a potential purchaser of residential mortgage loans and informed Lincoln about the package of loans which CES previously advised Martin it would like to sell. Martin repeated the description of the loans which CES had previously described, namely the interest rates, the location of the residential properties and the fact that the loans were covered by "100% default insurance." Neither Martin nor TMSI had previously investigated the financial history of CES, the credit worthiness of the borrowers nor the terms of the insurance policy. Martin never explained what the term "100% default insurance" meant nor was he asked by CES for any further details. Martin did not try to persuade Lincoln to purchase the mortgage loans. Lincoln informed Martin that it was interested in the offer and asked Martin to have CES forward to Lincoln the information about the loans, including a copy of the insurance policy. Thereafter, Lincoln and CES negotiated the sale between themselves. Neither Martin nor TMSI saw any of the documents or were asked for any further information about either the loans or the

insurance coverage. Martin and TMSI simply performed the mortgage broker's task of matchmaker, by bringing the parties together to examine and negotiate a deal.

When the first loans went into default, Beneficial, as the insurance carrier, paid them in full. Thereafter, Beneficial asserted various technical conditions as defenses to Lincoln's claims, with the result that a lawsuit was commenced by Lincoln against Beneficial. The suit was settled by Beneficial paying Lincoln $16,250,000.00. The balance of Lincoln's $31 million claim forms the basis for its claims in this case.

In light of the facts in this case, FDIC has failed to establish that TMSI made any negligent misrepresentations. It has not been established that the loans were not covered by "100% default insurance" or that the mortgagors were not credit-worthy when the loans were made, or when they were sold to Lincoln. In any event, TMSI never impliedly represented that it had performed any credit checking, especially since the loans were covered by insurance. Moreover, TMSI, as a typical mortgage broker, had no duty to investigate the loans or explain to Lincoln all the conditions in the insurance policy, even if Lincoln did not ask TMSI for this information. Simply because TMSI was also engaged in transactions with other parties unconnected with this case as a securities broker dealer does not mean that its mortgage loan transactions with Lincoln should carry the fiduciary responsibilities of a securities broker-dealer by virtue of its status as a nationally known securities broker. *See In re Atlantic Financial Management, Inc. Securities Litigation,* 658 F.Supp. 380, 382 (D.Mass.1986).

Even if Lincoln relied on TMSI's status and reputation, it had no right to assume that TMSI analyzed and investigated the credit-worthiness of the mortgagors or that it was familiar with all of the conditions of the insurance policy covering the loans. In its role as mortgage broker, TMSI fulfilled its task when it brought the buyer, Lincoln, and the seller, CES, together to negotiate and consummate the mortgage transactions between themselves.

A broker's primary function is to bring a buyer and seller together to negotiate with each other for the purpose of making a contract. [citation omitted]

....

The duty of a broker is to act with good faith toward his principal and not to act in any manner inconsistent with his agency or trust. *Rothman Realty Corp. v. Bereck,* 73 N.J. 590, 599, 376 A.2d 902 (1977); *Selcow v. Floersheimer,* 20 A.D.2d 889, 248 N.Y.S.2d 934, 935 (App. Div.1964). It is the broker's duty to keep the principal fully informed of all material facts which come to the broker's attention with respect to the transaction in which he is engaged and which affect the principal's interest and might influence his action. *Silverman v. Bresnahan,* 35 N.J.Super. 390, 395, 114 A.2d 307 (App. Div.1955); *Murph & Fritz's Place, Inc. v. Loretta,* 112 Misc.2d 554, 447 N.Y.S.2d 205, 207 (Cty.Ct.1982); *Union Bank of Switzerland v. HS Equities, Inc.,* 457 F.Supp. 515, 522 (S.D.N.Y.1978). The duty to divulge information does not extend to all matters peripherally affecting the transaction. *See, Sullivan v. Jefferson, Jefferson & Vaida,* 167 N.J.Super. 282, 287, 400 A.2d 836 (App.Div.1979); *Murph & Fritz's Place,* 447 N.Y.S.2d at 209. *See also, Harrington v. Norco Fruit Distributors, Inc.,* 40 A.D.2d 668, 337 N.Y.S.2d 59, 60 (App.Div.1972), *aff'd,* 33 N.Y.2d 607, 347 N.Y.S.2d 570, 301 N.E.2d 542 (N.Y.1973) (commodities broker was under no obligation, except as provided in U.C.C. § 7–507); *Thorp v. Gosselin Hotel Co.,* 65 Ill.App.2d 107, 212 N.E.2d 1, 4 (1965) (broker for prospective purchaser of hotel had no duty to explore hotel's profits, nor to advise principal to inspect property, nor to completely inspect property himself).

The standard by which a broker's performance is to be measured is to be found in the brokerage agreement, and not in the agreement between the principal and a customer. *Sanders A. Kahn Associates, Inc. v. Maidman,* 69 Misc.2d 90, 329 N.Y.S.2d 121, 123 (Sup.Ct.1971), *aff'd,* 38 A.D.2d 798, 329 N.Y.S.2d 318 (App.Div.), *aff'd,* 30 N.Y.2d 831, 335 N.Y.S.2d 77, 286 N.E.2d 462 (N.Y.1972). In performing his undertaking, a broker must exercise reasonable care, skill and diligence. *Sullivan,* 167 N.J.Super. at 286–87, 400 A.2d 836; *Murph & Fritz's Place,* 447 N.Y.S.2d at 207.

*Oscar Mayer Corp. v. Mincing Trading Corp.,* 744 F.Supp. 79, 82–83 (D.N.J.1990).

TMSI and its representative, Martin, made no fraudulent or negligent misrepresentations to Lincoln and merely acted as a typical mortgage broker bringing Lincoln and CES together to investigate, negotiate and consummate the sale of the package of mortgage loans. Accordingly, TMSI is not liable to Lincoln and its successor, FDIC, for the past and prospective defaulted loans which were not paid under the insurance policy issued to CES by Beneficial, or which will not be paid in the event of future defaults. Therefore, in this estimation litigation, FDIC's claim against TMSI on behalf of Lincoln will be disallowed as having no value.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).

2. FDIC has failed to establish by a preponderance of the evidence that TMSI, through its representatives, made any fraudulent or negligent misrepresentations to Lincoln when TMSI, acting as a mortgage broker, proposed to sell a package of mortgage loans covered by "100% default insurance."

3. Pursuant to 11 U.S.C. § 502(c)(1), FDIC's claim against TMSI on behalf of Lincoln is disallowed in its entirety.

SETTLE ORDER on notice.